# EXHIBIT A

**EFiled:  Feb 21 2026 02:43PM EST**
**Transaction ID 78524115**
**Case No. N26C-02-525 KMM CCLD**

**SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY**

| | |
|---|---|
| STROMA MEDICAL CORPORATION, a Delaware corporation, <br><br> and <br><br> GREGG HOMER, an individual, <br><br> *Plaintiffs*, <br><br> v. <br><br> STRATFORD INSURANCE COMPANY, an insurance company authorized to do business in Delaware, <br><br> *Defendant*. | C.A. No. _____ <br><br> JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiffs Stroma Medical Corporation ("Stroma") and Gregg Homer ("Homer," and together with Stroma, "Plaintiffs"), by and through counsel, allege as follows:

## I.    NATURE OF THE ACTION

1.    This is an action to enforce coverage under a directors' and officers' liability insurance policy (the "Policy") issued by Defendant Stratford Insurance Company ("Stratford") to Stroma.

- 1 -

2. Plaintiffs seek declaratory relief confirming Stratford's duty to reimburse defense expenses and to indemnify covered loss arising from a final judgment entered in *Blumberg v. Stroma Medical Corporation, et al.*, Case No. 30-2020-01172565-CU-BC-CJC (Cal. Super. Ct., Oct. 23, 2025), as well as damages resulting from Stratford's breach of the Policy and breach of the implied covenant of good faith and fair dealing.

3. Stratford has wrongfully denied or withheld coverage despite repeated notice, a final judgment fixing liability and damages, and the expiration of all contractual preconditions to suit. All contractual conditions precedent to suit, including the Policy's mandatory negotiation, mediation, and 30-day post-mediation waiting period, have been satisfied.

## II. THE PARTIES

4. Plaintiff Stroma Medical Corporation is a Delaware corporation with its principal place of business in California. Stroma is the named insured under the Policy.

5. Plaintiff Gregg Homer is an individual and was, at all relevant times, an officer and director of Stroma and an "Insured Person" under the Policy.

6. Defendant Stratford Insurance Company is an insurance company authorized to do business in Delaware.

### III.    JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction pursuant to 10 *Del. C.* §§ 541 and 6501. This matter qualifies for assignment to the Complex Commercial Litigation Division because it involves sophisticated insurance coverage issues, contractual interpretation of a multi-part directors' and officers' liability policy, and an amount in controversy exceeding $1 million.

8.    This Court has personal jurisdiction over Stratford because Stratford issued the Policy to a Delaware corporation and conducts business in Delaware.

9.    Venue is proper in this Court because Stratford issued the Policy to a Delaware corporation and the coverage obligations at issue arise from that Policy.

### IV.    THE POLICY

10.    Stratford issued the Policy to Stroma for the policy period beginning August 13, 2019. A true and correct copy of the Policy is attached as Exhibit A.

11.    The Policy provides $2 million in aggregate limits applicable to covered Loss other than Defense Expenses (Ex. A, pg. 1, Item 1), and a separate $1 million aggregate limit applicable solely to Defense Expenses (Ex. A, pg. 2, Item 4). The Defense Expense limit is separate from, and does not erode or reduce, the $2 million limit applicable to indemnity payments.

12.    The Policy insures both Stroma and its directors and officers, including Homer, for covered Claims and Loss. Ex. A, General Terms and Conditions, §§ II.E,

- 3 -

O; Executive and Private Company Liability Coverage Part, §§ II.B, C.

13.    Under the Policy, a "Claim" includes, among other things, a civil proceeding for monetary or non-monetary relief against an Insured Person for a Wrongful Act. Ex. A, Executive and Private Company Liability Coverage Part, § II.A.1.b, II.A.3.c.

14.    "Loss" includes: Defense Expenses; settlements; compensatory damages; judgments, including awarded costs, and pre-judgment and post-judgment interest; punitive, exemplary, and multiplied damages; and attorneys' fees awarded to the prevailing plaintiff's counsel pursuant to a covered judgment.  "Loss," other than Defense Expenses, excludes: civil or criminal fines or penalties imposed by law, other than punitive or exemplary damages; taxes; and any matter deemed uninsurable under the law pursuant to which the Policy is construed. Ex. A, Executive and Private Company Liability Coverage Part, § II.G.

15.    The Policy covers:  Insured Persons for non-indemnified Loss (Side A); the Insured Company for indemnified loss (Side B); and Insured Company entity coverage (Side C). Ex. A, Executive and Private Company Liability Coverage Part, §§ I.A-C.

16.    The Policy contains no choice-of-law provision. Under Delaware choice-of-law principles applicable to insurance contracts issued to Delaware corporations, Delaware law governs interpretation of the Policy.

- 4 -

## V.    THE UNDERLYING ACTION AND FINAL JUDGMENT

17.    In July 2020, Samuel Blumberg filed an action against Stroma, Homer, and others in the Superior Court of California, County of Orange (the "Underlying Action").

18.    Following trial, special verdicts, post-trial motions, and appellate proceedings, a final judgment was entered on October 23, 2025 (the "Final Judgment").

19.    The Final Judgment awarded, among other amounts:

a.    compensatory damages for conversion;
b.    punitive damages;
c.    attorneys' fees and costs; and
d.    post-judgment interest.

20.    A true and correct copy of the Final Judgment is attached as Exhibit B.

## VI.    STRATFORD'S COVERAGE CONDUCT

21.    Plaintiffs timely notified Stratford of the Underlying Action and demanded defense and indemnity coverage on February 10, 2023.

22.    By letter dated April 4, 2023, Stratford provisionally denied coverage.

23.    Stratford thereafter reimbursed certain post-notice defense expenses; however, approximately $187,753.81 in Defense Expenses remain unpaid and outstanding as of the date of this filing, exclusive of additional amounts continuing to accrue.

24.    Following entry of the Final Judgment, Plaintiffs demanded indemnity

coverage for covered Loss, including compensatory damages, punitive damages, attorneys' fees, costs, and post-judgment interest.

25.    Specifically, Plaintiffs demanded indemnity coverage for $2,145,330.11, comprised of $292,955.03 in compensatory damages, $1,168,126.00 in punitive damages, $250,803.00 in attorneys' fees, $41,971.00 in costs, and $391,475.08 in post-judgment interest (which interest continues to accrue).

26.    Stratford denied or withheld indemnity coverage based on positions that are contrary to the Policy and governing Delaware law.

27.    Most recently, Stratford contended that the Policy limit for indemnity payments was $1 million and that three exclusions under the Policy apply and threatened to recover the defense expenses it had already paid.

28.    With respect to the Policy limit, Stratford claimed that the Policy limit for indemnity payments was $1 million, and the $2,145,330.11 claim was far in excess of that limit. As alleged above, the Policy provides $2 million in aggregate limits applicable to Loss other than Defense Expenses, plus a separate $1 million limit for Defense Expenses.  Stratford's position that indemnity is capped at $1 million is contrary to the Policy declarations. To the extent the Final Judgment exceeds the applicable indemnity limit, Stratford is obligated to pay the full indemnity limit available under the Policy.

29.    With respect to the three exclusions under the Policy, Stratford claimed

that General Policy Exclusion A precludes coverage because Plaintiffs purportedly profited or gained an advantage they were not entitled to keep. Exclusion A precludes coverage of any Claim "brought about or contributed to by: (i) the gaining of any personal profit or financial advantage to which an Insured was not legally entitled . . . if such profit or advantage . . . is established by a final, non-appealable adjudication in the underlying action." Ex. A, General Terms and Conditions, § III.A. That exclusion applies only where the prohibited profit or advantage is established by a final, non-appealable adjudication. The Final Judgment contains no finding, and no final, non-appealable adjudication establishes, that any Insured obtained a personal profit or financial advantage to which he was not legally entitled. Absent such an adjudication in the Underlying Action itself, Exclusion A cannot apply as a matter of law.

30. Second, Stratford claimed that General Policy Exclusion G(4) precludes coverage because the Plaintiffs' Claim was for employment-related torts. Exclusion G(4) precludes coverage of any Claim "for any actual or alleged violation of any of the responsibilities, obligations or duties imposed by . . . any employment-related tort." Ex. A, General Terms and Conditions, § III.G.4. The Claim at issue, however, was for Plaintiffs' alleged conversion of shares of Stroma stock. Conversion is a property-related tort, not an employment-related tort. The conversion claim was based on alleged interference with ownership interests in

shares of stock, not on any employment relationship, compensation dispute, or employment duty. The factual predicate required to trigger Exclusion G(4) does not exist.

31. Third, Stratford claimed that Entity Exclusion G precludes coverage for contract liability. Exclusion G precludes coverage of any Claim "based upon or attributable to liability under any oral or written contract or agreement." Ex. A, Executive and Private Company Liability Coverage Part, § III.G. Again, however, the Claim at issue was for the alleged conversion of Stroma stock, and conversion arises from property rights, not contract rights. Indeed, Exclusion G is expressly inapplicable "to an Insured's alleged liability that exists in the absence of such contract or agreement." *Id*. Moreover, the Final Judgment found no liability for breach of contract. Liability was imposed solely for conversion, a tort that exists independent of any contract. The Final Judgment expressly rejected breach-of-contract liability. Accordingly, Exclusion G does not apply under its own terms.

32. The Policy expressly includes punitive and exemplary damages within the definition of covered Loss, subject only to matters deemed uninsurable under the law pursuant to which the Policy is construed. Under Delaware law, punitive damages are insurable absent a specific statutory prohibition, and Stratford has identified no Delaware authority rendering the punitive damages at issue uninsurable.

- 8 -

33.     Stratford has not identified any Policy provision excluding attorneys' fees, taxable costs, or post-judgment interest from covered Loss.

34.     Stratford's refusal to pay covered amounts forced Plaintiffs to retain counsel and commence this action to obtain policy benefits that should have been paid without litigation, a consequence that was reasonably foreseeable at the time of contracting and denial.

## VII.   BANKRUPTCY PROCEEDING (LIMITED ALLEGATIONS)

35.     On December 8, 2025, Stroma filed a voluntary petition for relief under Chapter 11, Subchapter V, in the United States Bankruptcy Court for the District of Delaware.

36.     The Policy and the coverage rights asserted herein constitute property of Stroma's bankruptcy estate.

37.     Stratford knew or should have foreseen that denial of coverage would impair Stroma's ability to satisfy the Final Judgment and continue operations.

## VIII.  COUNT I — DECLARATORY JUDGMENT (10 *Del. C.* § 6501)

38.     Plaintiffs repeat and reallege the foregoing paragraphs.

39.     An actual controversy exists regarding Stratford's obligations under the Policy.

40.     Plaintiffs seek a declaration that:

a.      the Policy provides coverage for Defense Expenses incurred in

the Underlying Action;

b.   the Policy provides coverage for Loss imposed by the Final Judgment, including compensatory damages, punitive damages, attorneys' fees, taxable costs, and pre- and post-judgment interest, subject to the applicable indemnity limit;

c.   Stratford must pay the full indemnity limit available under the Policy; and

d.   Delaware law governs interpretation of the Policy.

## IX.   COUNT II — BREACH OF CONTRACT

41.   Plaintiffs repeat and reallege the foregoing paragraphs.

42.   The Policy is a valid and enforceable contract.

43.   Plaintiffs complied with all conditions precedent under the Policy, including timely notice, participation in mediation, and satisfaction of the Policy's post-mediation waiting period before filing suit.

44.   Stratford breached the Policy by failing to reimburse Defense Expenses and by denying or withholding indemnity coverage for covered Loss.

45.   Plaintiffs have suffered damages as a result of Stratford's breach.

## X.   COUNT III — BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (BAD FAITH)

46.   Plaintiffs repeat and reallege the foregoing paragraphs.

47.   Stratford lacked any reasonable basis under the express terms of the

- 10 -

Policy to deny or withhold coverage and did so with knowledge of, or reckless disregard for, the absence of any reasonable justification.

48. Stratford's coverage positions are contrary to the plain language of the Policy and ignore the absence of any adjudicated findings required to trigger the cited exclusions.

49. As a direct and proximate result of Stratford's unreasonable denial and withholding of coverage, Plaintiffs have incurred additional damages beyond unpaid policy benefits, including attorneys' fees and litigation expenses reasonably incurred to obtain coverage that should have been paid without litigation.

50. As a foreseeable consequence of Stratford's refusal to pay covered amounts, Stroma incurred substantial additional expenses, including restructuring costs and professional fees associated with its Chapter 11 proceeding.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment:

A. Declaring Stratford's coverage obligations under the Policy;

B. Awarding damages for breach of contract;

C. Awarding consequential and extra-contractual damages as permitted by Delaware law, including attorneys' fees and litigation expenses incurred to obtain coverage benefits wrongfully withheld;

D. Awarding pre- and post-judgment interest; and

- 11 -

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

BAYARD, P.A.

*/s/ Sarah T. Andrade*
Sarah T. Andrade (No. 6157)
Joshua K. Tufts (No. 7275)
600 N. King Street, Suite 400
Wilmington, DE 19801
sandrade@bayardlaw.com
jtufts@bayardlaw.com
(302) 655-5000

Dated: February 21, 2026

*Attorneys for Plaintiffs Stroma Medical Corporation and Gregg Homer*

- 12 -

**EFiled:  Feb 21 2026 02:43PM EST**
**Transaction ID 78524115**
**Case No. N26C-02-525 KMM CCLD**

# EXHIBIT A

STOCK COMPANY

**VALIDUS SPECIALTY**
An AIG company

# AlphaPack Commercial

## POLICY DECLARATIONS

**POLICY NUMBER:** PDO9000829
Prior Policy Number: PDO9000176

| | | |
|---|---|---|
| ☐ WESTERN WORLD INSURANCE COMPANY | ☐ TUDOR INSURANCE COMPANY | ☑ STRATFORD INSURANCE COMPANY |

Named Insured and Mailing Address:

Stroma Medical Corporation

30 Hughes, Suite 206
Irvine, CA  92618

Agent/Broker #     32401
Premium             $12,624

Producer:

Business Risk Partners

2 Waterside Crossing Suite 102
Windsor, CT  06095

Policy Period:

From:     08/13/2019     To:     08/13/2020     12:01AM, standard time at your mailing address shown above.

IN EXCHANGE FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL TERMS, CONDITIONS, EXCLUSIONS AND ENDORSEMENTS OF THIS POLICY, WE AGREE TP PROVIDE THE INSURANCE AS STATED IN THIS POLICY

| Item 1. | POLICY MAXIMUM AGGREGATE LIMIT OF LIABILITY: | $2,000,000 |
|---|---|---|

**Item 2.     COVERAGE PARTS**
THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH AN AGGREGATE LIMIT OF LIABILITY IS INDICATED.

| Coverages Purchased | Coverage Part | Separate Limit of Liability | Limits of Liability Shared with: |
|---|---|---|---|
| ☑ | Executive and Private Company Liability ("D&O") | ☑ | |
| ☐ | Employment Practices and Third Party Liability ("EPL") | | |
| ☐ | Fiduciary Liability ("Fiduciary") | | |
| ☐ | Cyber Liability ("Cyber") | | |

CDEC 2001 (10/17)

## Executive and Private Company Liability

Aggregate Limit of Liability:                 $2,000,000          Pending or Prior Litigation Date:          07/23/2012

Additional Dedicated Limit of Liability for Non-Indemnified **Loss:**  $500,000
Sub-Limit of Liability for **Derivative Investigations Costs:** $250,000

Aggregate A Retention:          $0
Aggregate B Retention:          $25,000
Aggregate C Retention:          $25,000
Aggregate D Retention:          $0

## Employment Practices Liability

Aggregate Limit of Liability:                 $                    Pending or Prior Litigation Date:

Sub-Limit of Liability for **Third-Party Discrimination:** $

Aggregate A Retention:          $
Aggregate B Retention:          $

## Fiduciary Liability

Aggregate Limit of Liability:                 $                    Pending or Prior Litigation Date:

Sub-Limit of Liability for **Voluntary Settlement Programs** $

Aggregate A Retention:          $
Aggregate B Retention:          $

## Cyber Liability

Aggregate Limit of insurance:

|  | Limit of Insurance | Retention |
|---|---|---|
| Network Security Liability | NA | NA |
| Privacy Liability | NA | NA |
| Regulatory Proceeding | NA | NA |
| Breach Remediation Costs | NA | NA |
| Cyber Extorsion | NA | NA |

## Commercial Crime

Aggregate Limit of Insurance:          N/A

|  | Limit of Insurance | Deductible |
|---|---|---|
| Fidelity | NA | NA |
| Forgery or Alteration | NA | NA |
| Inside the Premises - Theft of Money and Securities | NA | NA |
| Inside the Premises - Robbery or Safe Burglary of Other Property | NA | NA |
| Outside the Premises | NA | NA |
| Computer and Funds Transfer Fraud | NA | NA |
| Money Orders and Conterfeit Money | NA | NA |

| Item 3. | Discovery Period: | 1 Year | 100% of Policy Premium |
|---|---|---|---|
| Item 4. | Additional Defense Expenses: | $1,000,000 | |

CDEC 2001 (10/17)

Item 5.        Forms and endorsements applying to this policy and attached at time of issue:

| Form No | ED Date | Form Name |
|---------|---------|-----------|
| CDEC 3003 | 10/17 | Amend Pending or Prior Litigation Date Endorsement (D&O) |
| CGTC 3068 | 12/17 | Amended Notice of Claim and Wrongful Act (CEO, CFO, GC, Risk Manager, HR Manager) |
| CGTC 3082CA | 01/18 | California Changes |
| IL 09 85 | 01/15 | Disclosure Pursuant to Terrorism Risk Insurance Act |
| CGTC 3073 | 12/17 | Duty to Defend and 100% Defense Allocation |
| CGTC 3079 | 12/17 | Notice Endorsement |
| FI 3006 | 03/18 | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |
| OFAC 3001 | 04/18 | U.S. Economic and Trade Sanctions Endorsement |
| CDO 3006 | 10/17 | Absolute Bodily Injury Property Damage Exclusion Endorsement |
| CDO 3002 | 10/17 | Additional Side A Limit Amended Endorsement |
| CDO 3023 | 10/17 | Crisis Management Expense Coverage |
| CDO 3007 | 10/17 | False Advertising / Product Defect Exclusion |
| CDO 3022 | 10/17 | Professional Services Exclusion with Securityholder Carveback |

THESE DECLARATIONS TOGETHER WITH THE COMPLETED AND SIGNED APPLICATION FOR THE FOLLOWED POLICY AND THE POLICY FORM ATTACHED HERETO CONSTITUTE THE POLICY

# WESTERN WORLD INSURANCE GROUP

Western World Insurance Company

Tudor Insurance Company

Stratford Insurance Company

Administartive Office

300 Kimball Drive, Suite 500

Parsippany, New Jersey 07054

We will provide the insurance described in this policy in return for the premium and complience with all applicable provisions of this policy. If required by state law, this policy shall not be valid unless countersigned by our authorized representative.

| Secretary | President |
|-----------|-----------|

Countersigned:

By: _____

Authorized Representative

CDEC 2001 (10/17)

## GENERAL TERMS AND CONDITIONS

THIS IS A CLAIMS MADE AND REPORTED POLICY. PLEASE READ IT CAREFULLY. ALL WORDS IN **BOLD** FACE TYPE SHALL HAVE THE MEANINGS SET FORTH IN SECTION **II. GENERAL DEFINITIONS** OF THESE GENERAL TERMS AND CONDITIONS, OR UNDER THE **DEFINITIONS** SECTION OF EACH **COVERAGE PART**.

In consideration of the payment of Premium, and subject to the agreement of the **Named Insured** to pay the Retention amount stated in the Declarations and as set forth in this Policy, and in reliance upon the **Application**, which shall be deemed incorporated herein, and subject to all of the terms, conditions, limitations, exclusions, and endorsements to this Policy, the **Insurer** and the **Insured** agree as follows:

### I.   APPLICATION OF GENERAL TERMS AND CONDITIONS

This Policy is comprised of the **Application**, the Declarations, these GENERAL TERMS AND CONDITIONS, all **Coverage Parts** that have been purchased, and any endorsements. These GENERAL TERMS AND CONDITIONS apply to all **Coverage Parts** that have been purchased by the **Insured**, as indicated in Item 2. of the Declarations. A **Coverage Part** is included within this Policy and affords coverage only if the **Coverage Part** is designated in the Declarations as being purchased by the **Insured**. The respective terms and provisions of each **Coverage Part** shall apply only to that **Coverage Part** and shall in no way be construed as applying to any other **Coverage Part**. If any provision in these GENERAL TERMS AND CONDITIONS is inconsistent or in conflict with the terms and conditions of any **Coverage Part**, the terms and conditions of such **Coverage Part** shall control for purposes of that **Coverage Part**.

### II.   GENERAL DEFINITIONS

A.   **Advisory Board** means a board or committee of a **Company** formed pursuant to such **Company's** partnership agreement, resolutions, or equivalent organizational or governance documents.

B.   **Application** means the written application for this Policy along with any written attachments, warranties, and any other material submitted with or incorporated into such application, as well as any other documents submitted in connection with the underwriting of this Policy or any other policy issued by the **Insurer**, or any of its affiliates, of which this Policy is in whole or in part a renewal or replacement; and all publicly available documents prepared by the **Company** in the past 12 months and which are reviewed in connection with the underwriting of this Policy or any policy issued by the **Insurer** of which this Policy is in whole or in part a renewal or replacement.

C.   **Claim** shall have the meaning attributed to that term in each applicable **Coverage Part**; and solely with respect to the COMMERCIAL CRIME COVERAGE PART, if purchased, shall include any **Occurrence**.

D.   **Clean Up Costs** means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, remediating, containing, removing, treating, neutralizing, detoxifying, or assessing the effects of **Pollutants**.

E.   **Company** means: the (i) **Named Insured**; (ii) and any **Subsidiary** thereof; and (iii) in the event a bankruptcy proceeding is commenced by or against the foregoing entities, the resulting debtor-in-possession under United States bankruptcy law, or any equivalent status under foreign law.

F.   **Company Takeover** means:

1.   the **Named Insured** consolidating with or merging into, or selling all or substantially all of its assets to any other person or entity, or group of persons or entities acting in concert; or

2.  any person or entity or group of persons or entities acting in concert acquiring more than fifty percent (50%) of the outstanding stock or other interest representing the right to vote, designate or select: ( i ) a majority of the Board of Directors if the **Named Insured** is a corporation; or (ii) a majority of the management board if the **Named Insured** is a limited liability company.

G.  **Coverage Part** means each coverage part that is listed as purchased in Item 2. of the Declarations.

H.  **Defense Expenses** means reasonable and necessary legal fees and expenses incurred in the defense of a **Claim**, including the premium for an appeal bond; provided, however, that the **Insurer** shall not be required to apply for or furnish such bonds. **Defense Expenses** shall not include: (i) any of the **Insured's** overhead expenses, or any wages, salaries, benefits, or costs of **Insured Persons** or any other representative, agent or servant of any **Insured**; (ii) **Dodd-Frank 954 Costs**; (iii) **Sox 304 Costs**; and (iv) **Derivative Investigation Costs**.

I.  **Derivative Investigation Costs** shall have the same meaning attributed to that term in each applicable **Coverage Part**

J.  **Dodd-Frank 954 Costs** shall have the same meaning attributed to that term in the EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART.

K.  **Domestic Partner** means any individual person legally recognized as a domestic or civil union partner under:

1.  the provisions of any applicable federal, state, or local law; or

2.  the provisions of any formal program established by the **Company**.

L.  **Employee** means any past or present employee whose labor or service is engaged by and directed by the **Company** while performing duties related to the conduct of the **Company's** business. **Employee** includes leased, part-time, seasonal and temporary workers, volunteers and interns; and independent contractors who are treated under applicable law as employees of the **Company**. **Employee** shall not include **Executives**.

M.  **Employment Claim** means any **Claim** alleging an **Employment Practices Wrongful Act** against an **Insured** brought by or on behalf of any past or present **Insured Person** or any applicant for employment with the **Company**.

N.  **Employment Practices Wrongful Act** means any actual or alleged:

1.  wrongful termination, including but not limited to discharge, or dismissal of employment, whether actual or constructive;

2.  violation of any federal, state, local, foreign, or common law prohibiting employment discrimination, including but not limited to: the Age Discrimination in Employment Act of 1967; the Americans with Disabilities Act of 1990; the Civil Rights Act of 1866 and 1991; the Civil Rights Law of 1964; the Equal Pay Act of 1963; the Family and Medical Leave Act of 1993; the Genetic Information Nondiscrimination Act of 2008; the Older Workers Benefit Protection Act of 1990; or any rule or regulation promulgated under any of the foregoing provisions;

3.  discrimination based upon race, color, age, religion, gender, sexual orientation, disability, national origin, pregnancy, or any other basis prohibited by law;

4.  wrongful: deprivation of career opportunity; failure to employ or promote; discipline or evaluation; demotion; denial of tenure; or modification of any term or condition of employment;

5.  retaliation in response to an **Employee** exercising any lawful right;

6.  sexual or other harassment in the workplace;

7.  abusive or hostile work environment, including workplace bullying and cyber bullying;

8.  negligent retention, hiring or training, supervision, or failure to provide or enforce consistent employment-related corporate policies or procedures; or

9.  employment-related libel, slander, misrepresentation, defamation, or invasion of privacy.

O.  **Executive** means any natural person who was, now is, or shall be a duly elected or appointed director, manager or member of the management board (if the **Company** is a limited liability company), **Advisory Board**, trustee, governor, officer, risk manager, Board Observer, Shadow/De Facto Director, or in-house general counsel, or a holder of a title, position or capacity equivalent to any of these positions, of any **Company**.

P.  **Insured** shall have the same meaning attributed to that term in each applicable **Coverage Part**.

Q.  **Insured Person** shall have the same meaning attributed to that term in each applicable **Coverage Part**.

R.  **Insurer** means the insurance company issuing this Policy.

S.  **Interrelated Wrongful Acts** means any **Wrongful Acts** that are:

1.  repeated or continuous;

2.  connected by reason of any common circumstance, situation, transaction, casualty, event, decision or policy; or

3.  part of the same series of facts, circumstances, situations, transactions, casualties, events, decisions, or policies.

T.  **Loss** shall have the same meaning attributed to that term in each applicable **Coverage Part**; and with respect to the COMMERCIAL CRIME COVERAGE PART, **Loss** means the amounts covered under such applicable **Coverage Part**.

U.  **Named Insured** means the entity identified as such in the Declarations.

V.  **Not-For-Profit Entity** means any corporation or organization other than the **Company** which is exempt from taxation under the Internal Revenue Code, as amended, or any rule or regulation promulgated thereunder.

W.  **Occurrence** shall have the same meaning attributed to that term in the COMMERCIAL CRIME COVERAGE PART.

X.  **Policy Period** means the time period beginning at the inception date and time specified in the Declarations as the Policy Period, and ending at the earlier of the expiration date and time stated in the Declarations as the Policy Period or the effective date and time of the cancellation of this Policy.

Y.  **Pollutants** means any substance that exhibits any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United States Environmental Protection Agency or any state, county, local, or foreign equivalent thereof, including, but not limited to, solids, liquids, gaseous, or thermal irritants, contaminants or smoke, vapor, dust, soot, fumes, acids, alkalis, chemicals or waste materials (including, but not limited to, recycled, reconditioned, or reclaimed sewage or waste water, nuclear materials, or infectious or medical waste); or any air emission, magnetic or electric waves or emissions, odor, oil or oil products, asbestos or asbestos products, fibers, mold, spores, fungi, germs, bacteria, viruses or any noise.

Z.  **Securities Claim** means any **Claim** that:

1.  a security holder of the **Company** brings in his or her capacity as such, whether individually or by class action, which alleges any **Wrongful Act** by the **Company** or an **Insured Person**; or brings derivatively on behalf of the **Company** alleging any **Wrongful Act** by any **Insured Person**; or

2.  in connection with the purchase or sale of, or offer or solicitation of an offer to purchase or sell, any securities of the **Company**, alleges the **Company** or an **Insured Person**: (i) committed a **Wrongful Act**; or (ii) violated any securities law, whether federal, state, local, or foreign, or any rule or regulation promulgated thereunder;

Provided, however, that **Securities Claim** shall not include any **Claim** by or on behalf of an **Insured Person** arising out of or in any way involving the loss of, or the failure to receive or obtain from the **Company**, any stock, stock warrants, or options or other securities of the **Company** or the benefit of stock, stock warrants, or options or other securities of the **Company**.

AA.  **Security Holder Derivative Demand** shall have the same meaning attributed to that term in each applicable **Coverage Part**.

BB.  **Sox 304 Costs** shall have the same meaning attributed to that term in the EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART.

CC.  **Subsidiary** means:

1.  any corporation or limited liability company of which the **Named Insured** owns, directly or indirectly through one or more of its **Subsidiaries**, more than fifty percent (50%) of the outstanding stock or other interest representing the present right to vote, designate, or select a majority of the Board of Directors of a corporation or of the management board of a limited liability company; but only during such time as the **Named Insured** owns, directly or indirectly through one or more of its **Subsidiaries**, more than fifty percent (50%) of such outstanding stock or other interest representing the present right to vote, designate, or select a majority of the Board of Directors of a corporation or of the management board of a limited liability company; or

2.  any joint venture entity in which the **Named Insured**, or any entity described in paragraph 1., above, has exactly fifty percent (50%) ownership of the interests of such joint venture entity and where, pursuant to a written joint venture agreement, the **Named Insured** or any entity described in paragraph 1., above, controls the management and operations of such joint venture entity.

In the event a **Subsidiary** is acquired at any point during the **Policy Period**, then Section **XIII**. **General Conditions**, Subsection E. **Mergers and Acquisitions**, of these GENERAL TERMS AND CONDITIONS shall apply.

DD.  **Third-Party Discrimination** means any violation of any federal, state, local, foreign, or common law concerning discrimination against, or sexual harassment of, any natural person other than an **Insured Person**, including customers, clients, vendors, service providers, and business invitees.

EE.  **Third-Party Discrimination Claim** means any **Claim** against an **Insured**, other than an **Employment Claim**, alleging any **Insured** committed **Third-Party Discrimination**.

FF.  **Voluntary Settlement** shall have the same meaning attributed to that term in the FIDUCIARY LIABILITY COVERAGE PART.

GG.  **Wrongful Act** shall have the same meaning attributed to that term in each applicable **Coverage Part**.

## III.  GENERAL POLICY EXCLUSIONS

The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim**:

A.  brought about or contributed to by: (i) the gaining of any personal profit or financial advantage to which an **Insured** was not legally entitled; or (ii) by the committing of any intentional criminal or deliberate fraudulent act, if such profit or advantage or intentional criminal or deliberate fraudulent act is established by a final, non-appealable adjudication in the underlying action. For the purpose of applying this exclusion, any **Wrongful Act** of the Chief Executive Officer or the Chief Financial Officer of the **Company** shall be imputed to such **Company**. With the exception of the possible imputation of **Wrongful Acts** described in the preceding sentence, no **Wrongful Act** of an **Insured** may be imputed to any other **Insured**. In addition, Section A. (i) of this exclusion shall not apply to any **Securities Claim** arising out of a public offering of securities of the **Company**;

B.  for any actual or alleged bodily injury, mental anguish or emotional distress, disease, sickness, or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; provided, however, this exclusion shall not apply to:

1.  emotional distress and mental anguish damages asserted in any **Employment Claim**;

2.  **Defense Expenses** incurred in a criminal proceeding for manslaughter (or for any similar offense); or

3.  any **Securities Claim**;

C.  arising out of, based upon or in consequence of, resulting from or in any way involving any written demand, suit, proceeding or other claim, or any investigation of which any **Insured** had notice, pending on or prior to the respective **Coverage Part** Pending or Prior Litigation Date stated in Item 2. of the Declarations, or any fact, matter, circumstance, situation, transaction or event underlying or alleged in such written demand, suit, proceeding, claim or investigation; provided, however, that this exclusion shall apply solely to the **Coverage Part** for which the **Insured's** notice of the written demand, suit, proceeding or other claim, or any investigation preceded its respective Pending or Prior Litigation Date;

D.  arising out of, based upon or in consequence of, resulting from or in any way involving;

   1.  any **Wrongful Act** alleged in any demand, suit, proceeding or other claim which has been the subject of any notice given or reported prior to the inception of the **Policy Period**, or in any circumstance of which notice has been given under any policy of which this Policy or any **Coverage Part** is a renewal, replacement, or succeeds in time; or

   2.  any other **Wrongful Act** whenever occurring, which together with a **Wrongful Act** which has been the subject of such prior claim or notice, would constitute **Interrelated Wrongful Acts**;

E.  arising out of, based upon or in consequence of, resulting from or in any way involving: ( i) any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic or personally identifiable nonpublic information; or (ii) any unauthorized access to, failure, malfunction or breakdown of any computer, electrical, electronic or mechanical systems, or machines; provided, however, that this exclusion shall not apply to any **Claim** otherwise covered under the CYBER LIABILITY COVERAGE PART, or any **Claim** brought by a shareholder of the **Company** otherwise covered under the EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART, if purchased;

F.  arising out of, based upon or in consequence of, resulting from or in any way involving any **Employment Claim**, **Third-Party Discrimination Claim**, **Employment Practices Wrongful Acts**, or **Third-Party Discrimination**; provided, however, this exclusion shall not apply to the EMPLOYMENT PRACTICES AND THIRD-PARTY DISCRIMINATION LIABILITY COVERAGE PART, if purchased; or

G.  for any actual or alleged violation of any of the responsibilities, obligations or duties imposed by:

   1.  the Employee Retirement Income Security Act of 1974 (ERISA), or amendments thereto or regulations thereunder or any similar foreign, state, local or common law; provided, however, that this exclusion shall not apply to any **Claim** otherwise covered by the FIDUCIARY LIABILITY COVERAGE PART, if purchased;

   2.  the Occupational Safety and Health Act (OSHA), the Worker Adjustment and Retraining Notification Act (WARN), the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), the National Labor Relations Act (NLRA), or other similar provisions of any federal, state or local statutory or common law, or any rules or regulations promulgated under any of the foregoing;

   3.  the Fair Labor Standards Act (FLSA), as amended, or any other foreign, federal, state, or local law, whether statutory or common law, governing the classification of employees to determine their eligibility for compensation or the payment of wages, overtime, on-call time, rest periods or minimum wages;

   4.  any employment-related tort; provided, however, that this paragraph shall not apply to any **Employment Claim** otherwise covered under the EMPLOYMENT PRACTICES AND THIRD-PARTY DISCRIMINATION LIABILITY COVERAGE PART, if purchased; or

   5.  any law governing workers' compensation, unemployment insurance, social security, disability benefits, or any similar foreign, state, local or common law;

   Provided, however, that this exclusion shall not apply to **Employment Claims** for retaliation otherwise covered under the EMPLOYMENT PRACTICES AND THIRD-PARTY DISCRIMINATION LIABILITY COVERAGE PART, if purchased.

## IV. DEFENSE AND SETTLEMENT

### A. Defense

1. The **Insureds**, and not the **Insurer**, shall have the duty to defend all **Claims**. It shall not be the duty of the **Insurer** to defend any **Claim** under this Policy; but the **Insurer** shall have a right to associate in the defense of all **Claims**.

2. No **Insured** may incur any **Defense Expenses** or admit any liability for, make any settlement offer with respect to, or settle any **Claim** without the **Insurer's** written consent, such consent not to be unreasonably delayed or withheld.

### B. Optional Tender of Defense

1. Notwithstanding Section **IV.**A., above, the **Named Insured** shall have the right to tender the defense of the **Claim** to the **Insurer** on behalf of all **Insureds** provided such right is exercised in writing at the time the **Claim** is first made and reported under **Section VIII. NOTICE OF CLAIM AND WRONGFUL ACT**, but in no event later than 30 days after the Insured first learns of the **Claim**.

2. From the date the **Claim** is first made against the **Insured** to the date when the **Insurer** accepts the optional tender of the defense of such **Claim**, no **Insured** may incur any **Defense Expenses** or admit any liability for, make any settlement offer with respect to, or settle such **Claim**, or take any action, or fail to take any required action, that prejudices the rights of the **Insureds** or the **Insurer** with respect to such **Claim**.

3. Provided that the **Insureds** have complied with the foregoing, the **Insurer** shall be obligated to assume the defense of the **Claim**, even if such **Claim** is groundless, false or fraudulent, provided, however, that the **Insurer** shall not be obligated to defend such **Claim** after the least of the following has been exhausted: (i) the Policy Maximum Aggregate Limit of Liability; (ii) the Aggregate Limit of Liability of the applicable **Coverage Part**; or (iii) or any applicable Sub-Limit of Liability.

4. The assumption of defense of the **Claim** shall be effective upon written confirmation sent by the **Insurer** to the **Policyholder**. Once the defense has been so tendered, the **Insured** shall have the right to effectively associate with the **Insurer** in the defense and negotiation of any settlement of any **Claim**, subject to the provisions of this Subsection **IV.**B. The Option to Tender afforded pursuant to this Subsection **IV.**B shall not be afforded for any **Claim** alleging, in whole or in part, any violation of the Fair Labor Standards Act (FLSA), as amended, or any other foreign, federal, state, or local law, whether statutory or common law, governing the classification of employees to determine their eligibility for compensation or the payment of wages, overtime, on-call time, rest periods or minimum wages.

### C. Settlement

The **Insurer** has the right to investigate, conduct negotiations and with the **Insured's** written consent, settle any **Claim** that is covered by this Policy. The **Insurer** shall not settle or compromise any **Claim** without the written consent of the **Insured**, such consent to not be unreasonably delayed or withheld.

## V. LIMITS OF LIABILITY

A. The amount stated in Item 1. of the Declarations as the Policy Maximum Aggregate Limit of Liability shall be the **Insurer's** maximum aggregate liability for all payment obligations under this Policy under all **Coverage Parts**, combined, including any matter noticed during the Discovery Period, if applicable. All obligations of the **Insurer** under this Policy shall cease after the Policy Maximum Aggregate Limit of Liability stated in Item 1. of the Declarations has been paid by the **Insurer**.

B.  The amounts stated in Item 2. of the Declarations as the Aggregate Limit of Liability for each purchased **Coverage Part** listed shall be the maximum aggregate limit of liability of the **Insurer** under such **Coverage Part** for all payment obligations under this Policy. The amount set forth in Item 2. of the Declarations as the Aggregate Limit of Liability for each respective **Coverage Part** purchased shall be part of, and not in addition to, the amount stated in Item 1. of the Declarations as the Policy Maximum Aggregate Limit of Liability under the Policy. The amounts stated in Item 2. of the Declarations as the Sub-Limit of Liability under such **Coverage Part**, or the amount(s) listed as Limits of Liability for covered loss under COMMERCIAL CRIME COVERAGE PART, shall be the maximum aggregate limit of liability for the **Insurer** under such sub-limited coverage, such amount being part of, and not in addition to, the Aggregate Limit of Liability for such **Coverage Part**. The **Insurer's** obligations under this Policy shall cease with respect to any respective **Coverage Parts** purchased after the Aggregate Limit of Liability under such **Coverage Part** has been paid by the **Insurer**.

If Shared Limits of Liability are indicated for any purchased **Coverage Part** under Item 2. of the Declarations, then each such Shared Limit of Liability shall be the maximum aggregate limit of the **Insurer's** liability for all amounts and all **Loss** of all **Insureds** during the **Policy Period** or the Discovery Period, if applicable, with respect to the applicable **Coverage Parts** subject to the shared limits, combined. The Limit of Liability respecting each **Coverage Part** which is indicated as Shared Limit of Liability in Item 2. of the Declarations shall be part of and not in addition to the Shared Limit of Liability of every other **Coverage Part** which is also indicated as Shared Limit of Liability in Item 2. of the Declarations. Furthermore, the Shared Limit of Liability for the Discovery Period shall be part of and not in addition to, this Shared Limit of Liability for the **Policy Period**. Each Shared Limit of Liability shall be part of and not in addition to the POLICY MAXIMUM AGGREGATE LIMIT OF LIABILITY in Item 1. of the Declarations. Any Sub-Limit of Liability provided in the Policy shall be part of and not in addition to Aggregate Limit of Liability as shown in the Declarations for the respective **Coverage Part** to which the Sub-Limit applies. Payment of **Loss** from such sublimit shall reduce the Aggregate Limit of Liability and any applicable Shared Limit of Liability.

C.  **Defense Expenses** are part of, and not in addition to, the applicable limit of liability, and payment of **Defense Expenses** by the **Insurer** shall reduce and may exhaust the applicable limits of liability; provided, however that:

1.  Notwithstanding anything in this Subsection C. to the contrary and subject to paragraphs 2. 3., and 4., immediately below, if an Additional Dedicated Limit of Liability for **Defense Expenses** is purchased as indicated in Item 4. of the Declarations, then an additional Limit of Liability in the amount indicated in the Declarations as the Additional Dedicated Limit of Liability for **Defense Expenses** shall be available solely for **Defense Expenses** covered under this Policy ("Additional **Defense Expenses**");

2.  The amount indicated in the Declarations as the Additional Dedicated Limit of Liability for **Defense Expenses** shall be the limit for all such Additional **Defense Expenses** per **Claim** and in the aggregate, which amount is in addition to, and not part of, the Aggregate Limit of Liability for any **Coverage Part** exhausted by payments by the **Insurer** for **Defense Expenses** covered by this Policy;

3.  Such Additional Dedicated Limit of Liability for **Defense Expenses** shall not apply to any **Claim** arising out of, based upon or in consequence of, resulting from or in any way involving: the same, or any similar or related, **Wrongful Act** or **Interrelated Wrongful Act** for which there has been any payment of **Loss** under any Aggregate Limit of Liability for any **Coverage Part**; and

4.  The Additional Dedicated Limit of Liability for **Defense Expenses** is excess any insurance available that is specifically excess to this Policy, and such excess insurance must be completely exhausted by payment of loss, damages or defense costs thereunder before the **Insurer** shall have any obligation to make any payment on account of the Additional Dedicated Limit of Liability for Non-Indemnified **Loss**.

D.  If coverage is available for a **Claim** under more than one **Coverage Part**, then the maximum applicable limit of liability for such **Claim** shall be the largest applicable remaining Aggregate Limit of Liability under only one of the applicable **Coverage Parts**. The **Insurer's** obligations under this Policy shall cease with respect to such a **Claim** when the largest applicable remaining Aggregate Limit of Liability under only one of the applicable **Coverage Parts** is exhausted.

## VI. RETENTIONS

A. With respect to each **Claim** covered under any **Coverage Part**, the **Insurer** shall only pay **Loss** which is in excess of the Retention that is applicable to such respective **Coverage Part** (or Insuring Agreement subject to a separate Retention under such **Coverage Part**, if indicated) as set forth in Item 2. of the Declarations, such Retention shall be borne by the **Insureds.**

With respect to covered loss under the COMMERCIAL CRIME COVERAGE PART, **Derivative Investigation Costs**, **Voluntary Settlements**, and **Supplemental Coverage**, the **Insurer** shall only pay such covered loss, **Derivative Investigation Costs**, **Voluntary Settlements**, and any amounts payable under **Supplemental Coverage**, which are in excess of the applicable Retention as set forth in Item 2. of the Declarations for such applicable **Coverage Part**, such Retention shall be borne by the **Insureds**.

Should the **Company** be unable or refuse to pay an applicable Retention due to bankruptcy or insolvency, the **Insurer** will then advance **Loss** within the Retention, subject to the other terms, conditions and exclusions of this Policy within sixty (60) days; provided, however, that the **Insurer** shall be entitled to recover such amounts advanced within the retention from the **Company**.

B. If a **Claim** could be subject to multiple Retentions, the largest applicable Retention set forth in Item 2. of the Declarations shall apply.

C. The applicable Retention shall not be reduced by any amounts that are determined to be non-covered loss pursuant to Section **XI. Allocation**, below.

## VII. ESTATES, LEGAL REPRESENTATIVES, SPOUSES, AND DOMESTIC PARTNER EXTENSION

A. Coverage under this Policy, subject to its terms and the terms of each **Coverage Part**, shall be extended to apply to **Claims** for a **Wrongful Act** of an **Insured Person** made against:

1. a natural person who, at the time the **Claim** is made, is the lawful spouse or **Domestic Partner** of an **Insured Person**, provided that such **Claim**:

   a) arises solely out of such spouse or **Domestic Partner's** status as the spouse or **Domestic Partner** of such **Insured Person**; or

   b) seeks recovery from marital community property, other property jointly held by the spouse or **Domestic Partner** and such **Insured Person**, or property transferred from such **Insured Person** to the spouse or **Domestic Partner**; or

2. the estate, heir, legal representative or assigns of an **Insured Person**, in the event of such **Insured Person's** death, incompetency, insolvency or bankruptcy.

B. There shall be no coverage extended under this Section for **Loss** resulting from a **Claim** arising from any act, error, or omission of any spouse, **Domestic Partner**, estate, heir, legal representative or assigns of such **Insured Person**.

## VIII. NOTICE OF CLAIM AND WRONGFUL ACT

A. As a condition precedent to the obligations of the **Insurer** under this Policy, the **Insureds** shall give the **Insurer** written notice of any **Claim,** or **Security Holder Derivative Demand** made during the **Policy Period** or the Discovery Period (if applicable) against an **Insured** as soon as practicable, but in all events before the later of:

1. ninety (90) days after the Policy expires and is renewed with the **Insurer**, provided however, if the **Insured** can prove to the **Insurer's** satisfaction that it was not reasonably possible for the **Insured** to give such notice within the ninety (90) day time period and that subsequent notice was given as soon as reasonably possible thereafter, the **Insurer** shall waive the foregoing time period; or

    2. sixty (60) days after:

       a) this Policy expires or terminates and is not renewed with the **Insurer**; or

       b) the expiration date of the Discovery Period, if applicable.

B. Notwithstanding the conditions and obligations set forth in Subsection A., above, in the event the **Insured** fails to provide timely notice of a **Claim**, coverage may be denied by the **Insurer** solely on the basis of late notice only if the **Insurer** can show that such late notice materially prejudiced its interests.

C. If during the **Policy Period** or the Discovery Period (if applicable), the **Insured** becomes aware of any circumstances which reasonably may be expected to give rise to a **Claim** being made against an **Insured**, and gives written notice to the **Insurer** of such circumstances, including the anticipated alleged **Wrongful Act(s)**, the reasons for anticipating such a **Claim**, and full particulars as to dates, persons and entities involved, then any **Claim** subsequently made against the **Insureds** arising out of the circumstances described in such notice shall be deemed to have been made at the time such notice was received by the **Insurer**.

D. The **Insureds** shall give notice to the **Insurer** under this Section at the address set forth by Endorsement to this Policy.

## IX. DISCOVERY PERIOD

A. If the **Named Insured** cancels or if the **Insurer** or the **Named Insured** refuses to renew this Policy, the **Named Insured** shall have up to thirty (30) days after the effective date of such cancellation or non-renewal, to pay the Additional Premium for the **Discovery Period** specified in Item 3. of the Declarations to extend the coverage granted by this Policy to any **Claim** first made during an additional period of time specified in Item 3. of the Declarations (the **Discovery Period**), which **Discovery Period** shall begin on the effective date of such cancellation or non-renewal; provided, however, that the **Named Insured** shall not be entitled to extend the coverage granted by this Policy by paying the Additional Premium for the **Discovery Period** if the Policy is rescinded, cancelled, or non-renewed as a result of a material misrepresentation on the **Application**.

Any coverage for **Claims** first made and first reported during the **Discovery Period** shall be limited only to **Wrongful Acts** that occurred prior to the inception of the **Discovery Period**.

B. The Additional Premium for the **Discovery Period** shall be fully earned at the inception of the **Discovery Period**; and the **Discovery Period** is not cancelable, except that the **Insurer** may cancel the **Discovery Period** for non-payment of premium.

C. The **Discovery Period** is not available and the provisions of this Section **IX. Discovery Period** shall not be applicable if the Policy is cancelled for non-payment of premium.

## X. SINGLE CLAIM/INTERRELATED WRONGFUL ACTS

All **Claims** based upon or arising out of the same **Wrongful Act** or out of **Interrelated Wrongful Acts** shall be considered a single **Claim**, and each such **Claim** is deemed to have been first made on the earlier of the following:

A. when the earliest **Claim** arising out of such **Wrongful Act** or **Interrelated Wrongful Acts** was first made; or

B. when written notice of a fact, circumstance, or situation giving rise to such **Claim** pursuant to Section **VIII. Notice of Claim and Wrongful Act**, Subsection C., above, was received by the **Insurer**.

## XI. ALLOCATION

If both **Loss** covered by this Policy and loss not covered by this Policy are incurred as a result of a **Claim**, the **Insurer** shall not be liable for that portion of such amount allocated to non-covered loss; and:

A.  With respect to all loss incurred by the **Insureds** in connection with such a **Claim**, the **Insureds** and the **Insurer** agree to use their best efforts to determine a fair and proper allocation of covered **Loss** and non- covered loss, taking into account the relative legal and financial exposures of and the relative benefits obtained in the defense and/or settlement of the **Claim** by the **Insureds**.

B.  In the event that the **Insurer** and the **Insureds** cannot agree upon an allocation, the **Insurer** shall make an interim payment for the **Loss** that is not in dispute until a different amount shall be agreed upon or determined pursuant to the provisions of this Policy and applicable law. If the **Insured** and the **Insurer** agree on an allocation of **Defense Expenses**, then the **Insurer** shall pay, on behalf of such **Insured**, **Defense Expenses** allocated to covered **Loss**. If, however, the **Insured** and the **Insurer** cannot agree on an allocation of **Defense Expenses**, no presumption as to allocation of **Defense Expenses** shall exist in any suit or other proceeding; but the **Insurer** shall pay, on behalf of such **Insured**, **Defense Expenses** which the **Insurer** believes to be covered until a different allocation is negotiated or judicially determined.

C.  Notwithstanding any prior advancement to the contrary, any negotiated or judicially determined allocation of **Defense Expenses** on account of a **Claim** shall be applied retroactively to all **Defense Expenses** on account of such **Claim**. Any allocation of **Defense Expenses** shall not apply to or create any presumption with respect to the allocation of other **Loss** on account of such **Claim**.

## XII. COORDINATION OF COVERAGE PARTS

A.  The **Insured** has elected to purchase the **Coverage Parts** as indicated in Item 2. of the Declarations by the appearance of a dollar amount Aggregate Limit of Liability corresponding to such **Coverage Part**, and any other **Coverage Part** available from the **Insurer** but not purchased by the **Insured** shall not be included in the Policy.

B.  Subject to the applicable Aggregate Limit of Liability, in the event any coverage is available for a **Claim** under more than one **Coverage Part** purchased, the **Insurer** shall only be liable for the actual amount of **Loss** incurred by the **Insureds**.

C.  The **Insurer** shall be entitled to make its own determination as to which **Coverage Part**, if any, **Loss** is covered and should be paid, regardless of the **Coverage Part** under which the **Insureds** provide notice of **Claim** or notice of circumstances which reasonably may be expected to give rise to a **Claim**.

## XIII. GENERAL CONDITIONS

A.  Cancellation and Non-Renewal

1.  The **Insurer** may cancel this Policy for non-payment of any premium when due by providing written notice to the **Named Insured** stating when, not less than twenty (20) days thereafter, such cancellation shall be effective.

2.  The **Named Insured** may cancel this Policy by providing written notice to the **Insurer** at the address set forth by Endorsement to this Policy, stating when thereafter such cancellation shall be effective. The **Insurer** shall retain the *pro rata* proportion of the premium calculated from the effective date of cancellation; provided, however, that if at the time of cancellation any **Claims** or notices of circumstance have been reported during the **Policy Period** under Section **VIII.**, above, then the entire premium shall be considered fully earned and non-refundable. Payment or tender of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

3.  In the event the **Insurer** decides not to renew this Policy, the **Insurer** shall provide written notice of such non-renewal to the **Named Insured** not less than thirty (30) days prior to the end of the **Policy Period**. The notice shall state the reason for such non-renewal. An offer to renew this Policy on terms that involve any change in Retention amount, premium, limit of liability or other terms or conditions shall not constitute a decision by the **Insurer** not to renew this Policy.

4.  Any notices to be given to the **Named Insured** shall be provided to the **Named Insured** at its last known principal address with a copy to its insurance agent or broker. The mailing by certified mail of such notice shall be sufficient.

B.  Action Against the Insurer

No action shall lie against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy.

C.  ADR Provision

The **Insurer** and the **Insured** agree that they will attempt in good faith to negotiate a resolution to any dispute arising out of this Policy. In the event any dispute cannot be resolved by negotiation, the **Insurer** and the **Insured** agree to submit the dispute to non-binding mediation, the terms of which shall be subject to negotiation. If the parties cannot agree to such terms within thirty (30) days of either party requesting the mediation, the matter will be submitted to JAMS for mediation, with each party bearing their own costs. Should the mediation fail to result in a settlement of the dispute, no party may commence an action against any other party until at least thirty (30) days after the conclusion of the final mediation session.

D.  Company Takeover

If a **Company Takeover** occurs during the **Policy Period**, then this Policy shall continue in full force and effect only for **Wrongful Acts** occurring prior to the effective date of the **Company Takeover**, unless:

1.  the **Named Insured** gives the **Insurer** written notice of the **Company Takeover** as soon as practicable but not later than thirty (30) days after the effective date of the **Company Takeover** and the **Insurer** agrees in writing to provide coverage for **Wrongful Acts** occurring after such effective date; and

2.  the **Named Insured** accepts any special terms, conditions, amendments, exclusions or additional premium charge required by the **Insurer**.

This Policy may not be canceled after the effective time of the **Company Takeover** and the entire premium for this Policy shall be deemed fully earned as of the effective date of the **Company Takeover**.

E.  Mergers and Acquisitions

1.  If the **Company**, during the **Policy Period**:

    a.  acquires another entity by merger or by consolidation with a **Subsidiary**, acquires all or substantially all of the assets of another entity, or creates or acquires a **Subsidiary**; and

    b.  provided such **Subsidiary** or acquired entity is not a public company, a financial services organization or provider; or a healthcare services or care organization or provider;

    then, subject to all the other provisions of this Policy, coverage shall apply to any **Claim** involving the merged or consolidated entity or **Subsidiary**.

2.  There shall be no coverage for any **Wrongful Act** or **Occurrence** involving the merged or consolidated entity or **Subsidiary** that occurred prior to the consummation of a transaction described in Paragraph 1., above, or for any other **Wrongful Act** whenever occurring which together with a **Wrongful Act** that occurred prior to the consummation of such transaction would constitute **Interrelated Wrongful Acts**.

3.  There shall be no coverage for any **Wrongful Act** of any **Subsidiary** or any of its directors, officers or employees occurring on or after the date such entity ceases to be a **Subsidiary**.

4.  If an entity ceases to be a **Subsidiary** during the **Policy Period**, coverage with respect to any **Coverage Part** for such **Subsidiary** and its **Insureds** shall continue until expiration of the **Policy Period** or termination of this Policy, whichever occurs first, but only for **Claims** for **Wrongful Acts** while such entity was a **Subsidiary**.

F.  Bankruptcy

Bankruptcy or insolvency of the **Company** or of an **Insured Person** shall not relieve the **Insurer** of any of its obligations hereunder; and the **Insurer** agrees not to oppose or object to any efforts to obtain relief from any automatic stay or injunction which may apply to this Policy or its proceeds.

G.  Representations

The **Insureds** agree that the **Application** is deemed attached to this Policy and incorporated herein, and that all warranties, statements and representations contained in or incorporated into the **Application** have been made to the **Insurer** and are material to the risk assumed by the **Insurer**. This Policy is issued in reliance upon the truth of such warranties, statements and representations. The **Insureds** further agree that in the event of any material misstatement, misrepresentation or omission in the **Application**, there shall be no coverage under this Policy for any **Insured** who had actual or imputed knowledge as of the inception date of the **Policy Period** of the facts that were misstated, misrepresented or omitted in the **Application** (whether or not such **Insured** was aware that such facts were misstated, misrepresented, or omitted in the **Application**). For purposes of determining the applicability of this Paragraph, any knowledge possessed by the Chief Executive Officer, the Chief Financial Officer, or the General Counsel of the **Named Insured** shall be imputed to the **Company**, but with the exception of the foregoing, any knowledge possessed by an **Insured** shall not be imputed to any other **Insured**.

H.  Other Insurance

Such insurance as is provided by this Policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is written as specific excess insurance over this Policy. This Policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this Policy may be obligated to pay **Loss**.

In the event a **Claim** against an **Insured** arising out of his or her service as an **Insured Person** who, with the knowledge and consent of the **Company**, is serving as a director, officer, trustee, regent or governor of any **Not-For-Profit Entity**, coverage as is afforded by this policy shall be specifically excess of any: (i) indemnification provided by such **Not-For Profit Entity**; and (ii) any other insurance provided to such **Not- For Profit Entity**.

I.  Subrogation

1.  The **Insurer** shall be subrogated to the extent of any payment made under this Policy to all of the rights of recovery of the **Insureds** against any person or organization. The **Insureds** shall do nothing to prejudice any of the **Insurer's** subrogation rights, and shall execute and deliver all papers and instruments required, and shall do whatever else is necessary, to enable the **Insurer** effectively to bring suit in their name and otherwise secure such rights. In no event, however, shall the **Insurer** exercise its subrogation rights against any **Insured Person** under this Policy, unless such **Insured Person** has been convicted of a criminal act, or been determined by a final adjudication to have committed a dishonest, fraudulent act or willful violation of any statute, rule or law, or determined by a final adjudication to have obtained any profit or advantage to which such **Insured Person** was not legally entitled.

2.  Any amount recovered after payment under this Policy shall be apportioned in the inverse order of any actual payment of the underlying **Claim** so the last dollar paid shall be the first dollar recovered. The expenses incurred in obtaining any such recoveries shall be apportioned in the ratio of the actual recoveries of the **Insurer** and the **Insureds**; and any amounts recovered, less the expenses incurred in obtaining any such recovery, shall be credited toward the applicable limit of liability.

J.  Assignment

This Policy and any and all rights hereunder are not assignable without the written consent of the **Insurer**.

K.  Entire Agreement

By acceptance of this Policy, the **Insureds** and the **Insurer** agree that this Policy (including the **Application**) and any written endorsements attached hereto constitute the entire agreement between the parties.

L.  Conformity to Statute

Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy are hereby amended to conform to such laws.

M.  Authorization

The **Insureds** agree that the **Named Insured** will act on behalf of the **Insureds** with respect to the giving of all notices to the **Insurer**, the receipt of notices from the **Insurer**, the payment of premiums, and the receipt of any return premiums that may become due under this Policy.

N.  Worldwide Territory

The Policy shall apply to **Claims** made against the **Insureds** anywhere in the world.

O.  Compliance with Laws Governing Trade and Economic Sanctions

Payment of **Loss** under this Policy shall be made only in full compliance with all economic or trade sanction laws and regulations, including but not limited to sanctions, laws, and regulations administered and enforced by the United States Treasury's Office of Foreign Asset Control (OFAC), and any other laws or regulations of the United States, European Union, or United Kingdom.

P.  Headings

The descriptions in the headings and any subheading of this Policy (including any titles given to any endorsement attached hereto) are inserted solely for convenience and do not constitute any part of the terms or conditions hereof.

THIS POLICY SHALL NOT BE VALID UNLESS COMPLETED BY THE ATTACHMENT HERETO OF THE DECLARATIONS PAGE AND SIGNED BY A DULY AUTHORIZED REPRESENTATIVE OF THE **INSURER**.

## EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART

THIS IS A "CLAIMS MADE AND REPORTED" COVERAGE PART. SUBJECT TO ITS TERMS AND PROVISIONS, THIS COVERAGE PART ONLY APPLIES TO CLAIMS FIRST MADE AGAINST THE INSUREDS, AND FIRST REPORTED TO THE INSURER IN THE TIME AND MANNER REQUIRED BY THIS POLICY. IN ADDITION, DEFENSE EXPENSES ARE INCLUDED IN AND WILL REDUCE THE LIMITS OF LIABILITY.

PLEASE READ THIS ENTIRE COVERAGE PART CAREFULLY. CONSULT YOUR BROKER OR OTHER REPRESENTATIVE IF YOU DO NOT UNDERSTAND ANY TERMS OR PROVISIONS OF THIS COVERAGE PART OR ANY OTHER PART OF THE POLICY.

In consideration of the payment of Premium, and subject to the agreement of the **Named Insured** to pay the retention amount stated in the Declarations and as set forth in this Policy, and in reliance upon the **Application**, which shall be deemed incorporated herein, and subject to all of the terms, conditions, limitations, exclusions, and endorsements to this Policy, the **Insurer** and the **Insured** agree as follows:

### I.    INSURING AGREEMENTS

#### A.    Insured Person Coverage For Non-Indemnified Loss

1.   **Insuring Agreement**

The **Insurer** shall pay, on behalf of any **Insured Persons**, **Loss** to the extent the **Company** has not indemnified such **Insured Persons**, arising from any **Claim** for any **Wrongful Act** taking place prior to the end of the **Policy Period**, and which is first made against the **Insureds** during the **Policy Period** or the Discovery Period (if applicable) and is reported to the **Insurer** in the time and manner required by this Policy.

2.   **Additional Dedicated Limit of Liability**

a.   Notwithstanding anything in this Policy to the contrary, an Additional Dedicated Limit of Liability for Non-Indemnified **Loss**, if purchased as indicated in Item 2 of the Declarations, shall be an additional Limit of Liability available solely for **Loss** covered under Insuring Agreement A.1., and shall be in an amount not to exceed $500,000 per **Claim** and in the aggregate, which amount is in addition to, and not part of, the Aggregate Limit of Liability for this **Coverage Part**, as set forth in Item 2. Of the Declarations.

b.   The Additional Dedicated Limit of Liability for Non-Indemnified **Loss** is excess of any insurance available that is specifically excess to this **Coverage Part**, and such excess insurance must be completely exhausted by payment of loss, damages or defense costs thereunder before the **Insurer** shall have any obligation to make any payment on account of the Additional Dedicated Limit of Liability for Non-Indemnified **Loss**.

#### B.    Private Company Coverage For Indemnified Loss

The **Insurer** shall pay, on behalf of the **Company**, **Loss**, to the extent the **Company** has indemnified **Insured Persons**, arising from any **Claim** for any **Wrongful Act** taking place prior to the end of the **Policy Period**, and which is first made against such **Insured** during the **Policy Period** or the Discovery Period (if applicable) and is reported to the **Insurer** in the time and manner required by this Policy.

#### C.    Private Company Entity Coverage

The **Insurer** shall pay, on behalf of the **Company**, **Loss** arising from any **Claim** for any **Wrongful Act** of the **Company** taking place prior to the end of the **Policy Period**, and which is first made against the **Company** during the **Policy Period** or the Discovery Period (if applicable) and is reported to the **Insurer** in the time and manner required by this Policy.

**D.    Derivative Investigation Costs Coverage for Security Holder Derivative Demands**

Subject to the Sub-Limit of Liability set forth in Item 2. of the Declarations, the **Insurer** shall pay, on behalf of the **Company**, **Derivative Investigation Costs** arising from a **Security Holder Derivative Demand** which is first made against the **Company** during the **Policy Period** or the Discovery Period (if applicable) and is reported to the **Insurer** in the time and manner required by this Policy.

## II.    DEFINITIONS

For the purposes of this **Coverage Part**:

**A.    Claim** means:

1.    under **INSURING AGREEMENTS** A. and B.:

    a.    a written demand for monetary, non-monetary, or injunctive relief made upon an **Insured Person** for a **Wrongful Act**;

    b.    a civil, proceeding for monetary or non-monetary relief against an **Insured Person** for a **Wrongful Act**, which is commenced by: service of a complaint or similar pleading; receipt of a notice of charges; or receipt of a Wells notice;

    c.    a criminal proceeding brought against an **Insured Person** for a **Wrongful Act**, which is commenced by an arrest or a return of an indictment or information;

    d.    a formal administrative or formal regulatory proceeding against an **Insured Person** for a **Wrongful Act**, which is commenced by the filing of a notice of charges, formal investigative order or similar document;

    e.    a mediation or arbitration proceeding commenced by receipt of a demand for arbitration, demand for mediation or similar document alleging a **Wrongful Act** against an **Insured Person**;

    f.    an official request for **Extradition**, or the execution of a warrant for the arrest of any **Insured Person** where such execution is an element of **Extradition**, against an **Insured Person** for a **Wrongful Act**;

    g.    a civil, criminal, administrative, or regulatory investigation of an **Insured Person** for a **Wrongful Act** once such **Insured Person** who is identified in writing by the investigating authority undertaking the investigation as someone against whom a formal proceeding may be commenced, including when such **Insured Person** is served with a target letter or similar document; or

    h.    any written request to toll or waive a statute of limitations received by an **Insured Person** relating to a potential **Claim** described in Paragraphs **II.**A.1.a. through **II.**A.1.g., above.

2.    solely under **INSURING AGREEMENT** A. service of a subpoena or other similar written request upon an **Insured Person** compelling document production or witness testimony in connection with:

    a.    any matters described in Paragraphs **II.**A.1.a. through **II.**A.1.g., above; or

    b.    any equivalent action against the **Company**, provided, however, that the **Insurer** shall only pay **Defense Expenses** incurred solely by such **Insured Person** in responding to such subpoena or written request that is in connection with any such equivalent action against the **Company**.

3.  under **INSURING AGREEMENT** C.:

    a.  a written demand for monetary, non-monetary, or injunctive relief made upon the **Company** for a **Wrongful Act** of the **Company**;

    b.  a civil, proceeding for monetary or non-monetary relief against the **Company** for a **Wrongful Act**, which is commenced by: service of a complaint or similar pleading; receipt of a notice of charges; or receipt of a Wells notice;

    c.  a criminal proceeding brought against the **Company** for a **Wrongful Act**, which is commenced by a return of an indictment, information, or similar document;

    d.  a formal administrative or formal regulatory proceeding against the **Company** for a **Wrongful Act**, which is commenced by the filing of a notice of charges, formal investigative order or similar document, but only while such proceeding is also pending against an **Insured Person**;

    e.  a mediation or arbitration proceeding commenced by receipt of a demand for arbitration, demand for mediation or similar document alleging a **Wrongful Act** against the **Company**; or

    f.  any written request to toll or waive a statute of limitations received by an **Insured Person**
relating to a potential **Claim** described in Paragraphs **II.**A.3.a. through **II.**A.3.e., above.

B.  **Insured** means the **Company** or any **Insured Person**.

C.  **Insured Person** means any **Executive** or any **Employee**.

D.  **Derivative Investigation Costs** means any reasonable and necessary fees (including but not limited to attorneys' fees and experts' fees), expenses, costs, or charges incurred by the **Company** (including its Board of Directors or any committee of its Board of Directors) with the **Insurer's** prior written consent while investigating or evaluating whether it is in the best interest of the **Company** to commence a civil proceeding as demanded by a **Security Holder Derivative Demand**; provided, however, **Derivative Investigation Costs** shall not include (i) any damages, judgments, or settlements; and (ii) salaries, wages (including overtime wages), or fees of any **Executive** or **Employee**.

E.  **Dodd-Frank 954 Costs** means the reasonable and necessary expenses, fees, and costs consented to by the **Insurer** and incurred by an **Executive** solely to facilitate the return of amounts required to be repaid by such **Executive** pursuant to Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act; provided, however, that **Dodd-Frank 954 Costs** shall not include the reimbursement, payment, return, disgorgement, or restitution of any such amounts requested or required to be repaid by such **Executive**.

F.  **Extradition** means any formal process by which an **Insured Person** located in any country is surrendered to any other country for trial or to otherwise answer any criminal allegations.

G.  **Loss** means **Defense Expenses, Dodd-Frank 954 Costs**, **Sox 304 Costs**, and the amounts an **Insured** is legally obligated to pay as a result of any **Claim**, including:

    1.  settlements;

    2.  compensatory damages;

    3.  judgments, including awarded costs, and pre-judgment and post-judgment interest;

    4.  punitive, exemplary and multiplied damages;

    5.  civil fines or penalties assessed against **Insured Persons** pursuant to Section 2 (g) (2) (B) of the Foreign Corrupt Practices Act 15 U.S.C. 78 dd-2 (g) (B); and

    6.  attorney fees awarded to the prevailing plaintiff's counsel pursuant to a covered judgment.

        CDO 1001 (12/17)

**Loss**, other than **Defense Expenses**, shall not include:

1. any civil or criminal fines or penalties imposed by law, other than punitive or exemplary damages or the multiple portion of a judgment or award of multiplied damages or the civil fines or penalties assessed against **Insured Persons** pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act 15 U.S.C. 78dd-2(g)(B);

2. taxes;

3. **Clean Up Costs**;

4. the cost of any non-monetary relief, including without    limitation: any costs associated with complying with any injunctive relief of any kind or nature imposed by any judgment or settlement, and the costs associated with the modification of any building or property in order to provide any reasonable accommodation under the Americans With Disabilities Act or any similar foreign, federal, state, or local statute, regulation, or common law;

5. any amount for which the **Insureds** are not financially liable or which are without legal recourse to the **Insureds**; or

6. any matter deemed uninsurable under the law pursuant to which this Policy shall be construed;

The **Insureds'** good faith determination as to the insurability of matters otherwise included within this definition shall not be contested by the **Insurer**; such good faith determination shall be based upon the most favorable law bearing a reasonable relationship to the **Insured**, the **Insurer**, or the **Claim**.

H. **Security Holder Derivative Demand** means a written demand by shareholders of the **Company**, other than an **Executive**, made upon its Board of Directors (or similar management body) which seeks to compel the Board of Directors (or similar management body) to bring, on behalf of the **Company**, a civil proceeding in a court of law against any **Executive** for such **Executive's Wrongful Act**.

I. **Sox 304 Costs** means the reasonable and necessary costs, fees, and expenses consented to by the **Insurer** and incurred by an **Executive** that is the Chief Executive Officer or Chief Financial Officer of the **Named Insured** solely to facilitate the return of amounts required to be repaid by such **Executive** pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002; provided, however, that **Sox 304 Costs** shall not include the reimbursement, payment, return, disgorgement, or restitution of any such amounts requested or required to be repaid by such **Executive**.

J. **Wrongful Act** means:

1. any actual or alleged breach of duty, error, misstatement, act or omission of an **Executive** but solely while acting in his or her capacity as such;

2. any actual or alleged breach of duty, error, misstatement, act or omission of an **Employee** but solely while acting in his or her capacity as such;

3. any actual or alleged breach of duty, error, misstatement, act or omission by the **Company**; or

4. any Interrelated Wrongful Act.

CDO 1001 (12/17)

## III.  EXCLUSIONS

The following Exclusions are applicable to all **INSURING AGREEMENTS**:

The **Insurer** shall not be liable to pay any **Loss** arising from any **Claim**:

A.  arising out of, based upon or in consequence of, resulting from or in any way involving any actual or alleged act or omission of an **Insured Person** taking place or allegedly taking place while (i) serving in any other capacity other than an **Insured Person** of the **Company**; including but not limited to his or her status as a director, officer, trustee, regent, governor, manager or member of the board of managers of any entity other than the **Company**; provided, however, that this exclusion shall not apply to any **Executive** while serving, with the knowledge and consent of the **Company**, as a director, officer, trustee, regent, governor, manager or member of the board of managers of any **Not for Profit Entity**;

B.  brought or maintained by or on behalf of any **Not for Profit Entity** which an **Insured Person** is or was serving with the knowledge and consent of the **Company**; provided, however, this exclusion shall not apply if the **Insured Person** has not served with, provided consultation in any capacity to, or has been employed by the **Not for Profit Entity** for at least two (2) years prior to the date such **Claim** is first made, and the **Claim** by the **Not for Profit Entity** is brought and maintained totally independent of and without the assistance, active participation or solicitation of the **Company** or any **Insured Person** who has served with, provided consultation in any capacity to, or has been employed by the **Company** in the last two (2);

C.  arising out of, based upon or in consequence of, resulting from or in any way involving any public offering of securities by the **Company**, or the solicitation, sale, purchase, distribution, or issuance of any such securities, or any **Wrongful Act** relating in any way to any such public offering, whether any such activity occurs or allegedly occurs prior to, during, or after such public offering of securities by the **Company**; provided, however, that this exclusion shall not apply to:

1.  the purchase or sale, or offer or solicitation of an offer to purchase or sell, any debt or equity securities in a private-placement transaction exempt from registration under the Securities Act of 1933, as amended;

2.  any of the following

    a.  any general solicitation or general advertising by or on behalf of any **Company** permitted pursuant to Title II, Access to Capital for Job Creators, of the Jumpstart Our Business Startups Act ("JOBS Act");

    b.  any offering, sale or purchase of securities that qualifies for a Securities Act registration exemption created pursuant to Title III Crowdfunding, of the JOBS Act; or

    c.  any offering, sale or purchase of securities that qualifies for a Securities Act registration exemption created pursuant to Title IV, Small Company Capital Formation, of the JOBS Act provided, however, that all such **Loss** payable as a result of this shall be limited per **Claim** and in the Aggregate to $250,000 Sub-Limit of Liability:

3.  any **Claim** for **Loss** alleging a **Wrongful Act** which occurred during the **Insured's** preparations to commence an initial public offering ("**IPO**") and which occurred at any time prior to 12:01a.m. on the date the **IPO** commences ("**IPO Effective Time**"), including any **Claim** for **Loss** alleging a **Wrongful Act** which occurred during the road show; provided, however, that the coverage otherwise afforded under this paragraph shall be deemed to be void *ab initio* effective the **IPO Effective Time** unless: (1) the **Claim** is first made and reported pursuant to the terms and conditions of this Policy prior to the **IPO Effective Time**; (2) the **IPO** fails to commence on the **IPO Effective Time**; and (3) a public company D&O policy is not applicable to such **Claim**;

D.   brought or maintained by or on behalf of any **Insured**, provided this exclusion shall not apply to:

   1.   a **Claim** that is a derivative action brought or maintained on behalf of the **Company** by one or more persons who are not **Insured Persons**, where: (i) the **Claim** is brought and maintained without the participation, solicitation or active assistance of the **Company** or any **Insured Person**; or (ii) any such participation, solicitation or active assistance of the **Company** or any **Insured Person** is protected by any whistleblower statute or is solely pursuant to, or in compliance with, an enforceable subpoena or legal process;

   2.   a **Claim** that is brought by an **Insured Person** for indemnity or contribution, provided the **Claim** directly results from another **Claim** that is covered under this Policy;

   3.   a **Claim** that is brought by or on behalf of a bankruptcy trustee, examiner, receiver, or creditors' committee of the **Company** against which such **Claim** is made, or any assignee of such bankruptcy trustee, examiner, receiver, or creditors' committee;

   4.   a **Claim** by an **Insured Person** who has not served as an **Insured Person** for at least two (2) years prior to the date such **Claim** is first made, and who brings and maintains such **Claim** without the participation, solicitation or active assistance of the **Company** or any other **Insured Person** who currently serves or has served within the past two (2) years as an **Insured Person**; or

   5.   any **Claim** against an **Insured Person** resulting from "Whistleblowing." For purposes of the preceding sentence, "Whistleblowing" means the disclosure by an **Insured** of mismanagement, corruption, illegality or other wrongdoing;

The following Exclusions are applicable to **INSURING AGREEMENT** C.:

The **Insurer** shall not be liable to pay any **Loss** arising from any **Claim**:

E.   arising out of, based upon or in consequence of, resulting from or in any way involving any violation of any statutory, regulatory or common law, governing any of the following activities: unfair trade practices, anti- trust, unfair competition, or tortious interference in another's business or contractual relationships;

F.   arising out of, based upon or in consequence of, resulting from or in any way involving any **Insured's** performance of or failure to perform professional services for others; provided, however, that this exclusion shall not apply to any derivative action alleging failure to supervise those who performed or failed to perform such professional services;

G.   based upon or attributable to liability under any oral or written contract or agreement including but not limited to any express warranties or guarantees, or liability assumed under any oral or written contract or agreement; provided, however, that this exclusion shall not be applicable to an **Insured's** alleged liability that exists in the absence of such contract or agreement;

H.   for infringement or violation of patent, trademark, trade secret copyright, misappropriation, plagiarism or any other intellectual property rights;

I.   arising out of, based upon or in consequence of, resulting from or in any way involving any actual or alleged any libel, slander, oral or written publication of defamatory or disparaging material, invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, malicious use or abuse of process, assault, battery or loss of consortium;

J.   arising out of, based upon or in consequence of, resulting from or in any way involving: (i) any violation of the Telephone Consumer Protection Act (TCPA), including any amendments or additions thereto, or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state, local, or foreign statutory or common law; or

K.  arising out of, based upon or in consequence of, resulting from or in any way involving any of the following:

1.  malfunction, defect, or failure of any goods or products manufactured, distributed, sold, installed, marketed, developed or processed by the **Insured**;

2.  failure of goods, products, brands or services to conform with any statements or misrepresentations of quality or performance made in the advertising, promotions, marketing or labeling; or

3.  incorrect or inadequate or misleading description of goods, products, brands or services in the advertising, marketing, promotions or labeling; or

4.  failure to warn or to provide any warnings relating to any risks associated with the use of any goods, products, brands or services, whether required by statute, law, ordinance, regulation or by common law, including but not limited to California Proposition 65, or any other similar or substantially similar federal, state, or local statute; or

## IV.  ADDITIONAL TERMS AND CONDITIONS

In addition to the provisions set forth in the GENERAL TERMS AND CONDITIONS, the following provisions shall apply to this **Coverage Part**:

A.  Order of Payments

In the event a covered **Claim** results in **Loss** payable under this Policy, the **Insurer** shall:

1.  first pay **Loss** for which coverage is provided under **Insuring Agreement A.**; then

2.  only after payment of all applicable **Loss** is made pursuant to paragraph IV.A.1., above, whatever amounts remaining of the Aggregate Limit of Liability for this **Coverage Part**, and subject to the Policy Maximum Aggregate Limit of Liability, shall be paid by the **Insurer** for any **Loss** covered under **Insuring Agreements B.**, **C.,** and **D.,** if the **Insurer** is directed to do so in writing by the **Named Insured**.

B.  If a **Company** fails or refuses, other than for reason of financial impairment, to indemnify an **Insured Person** for **Loss** to the fullest extent permitted by statutory or common law, then any payment by the **Insurer** of such **Loss** shall be excess of the Retention applicable to **INSURING AGREEMENT** B.

C.  Fully Non-Rescindable

The coverage provided by this **Coverage Part** shall not be rescinded by the **Insurer** for any reason; but such coverage shall be subject to all terms, conditions, and exclusions of this Policy.

THIS POLICY SHALL NOT BE VALID UNLESS COMPLETED BY THE ATTACHMENT HERETO OF THE DECLARATIONS PAGE AND SIGNED BY A DULY AUTHORIZED REPRESENTATIVE OF THE **INSURER**.

**NAMED INSURED:**     Stroma Medical Corporation
**POLICY NUMBER:**     PDO9000829

**THIS ENDORSEMENT MODIFIES:**     ALPHAPACK COMMERCIAL POLICY

### AMENDED PENDING OR PRIOR LITIGATION DATE ENDORSEMENT

In consideration of the payment of premium for this **Policy**, it is understood and agreed that the **Policy** is amended as follows:

Solely with respect to that portion of the Aggregate Limit of Liability that is excess of the first $1,000,000 in limits, the applicable **Pending or Prior Litigation Date** listed in Item 2. of the Declarations for the EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART is deleted and replaced with the following:

**Pending or Prior Litigation Date**:  08/06/2018

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

CDEC 3003 (10/17)

**NAMED INSURED:**      Stroma Medical Corporation
**POLICY NUMBER:**      PDO9000829

**THIS ENDORSEMENT MODIFIES:**      GENERAL TERMS AND CONDITIONS

## AMENDED NOTICE OF CLAIM AND WRONGFUL ACT (CEO, CFO, GC, Risk Manager, HR Manager) ENDORSEMENT

In consideration of the payment of premium for this Policy, it is understood and agreed that Section **VIII. NOTICE OF CLAIM AND WRONGFUL ACT** of the GENERAL TERMS AND CONDITIONS of the Policy is deleted and replaced with the following:

**VIII.  NOTICE OF CLAIM AND WRONGFUL ACT**

A.  As a condition precedent to the obligations of the **Insurer** under this Policy, the **Insureds** shall give the **Insurer** written notice of any **Claim,** or **Security Holder Derivative Demand** made during the **Policy Period** or the Discovery Period (if applicable) against an **Insured** as soon as practicable after the Chief Executive Officer, Chief Financial Officer, General Counsel, Risk Manager, Human Resource Manager, or any individual holding the functional equivalent of these positions first learns of such **Claim**, but in all events before the later of:

1)  ninety (90) days after the Policy expires and is renewed with the **Insurer**, provided however, if the **Insured** can prove to the **Insurer's** satisfaction that it was not reasonably possible for the **Insured** to give such notice within the ninety (90) day time period and that subsequent notice was given as soon as reasonably possible thereafter, the **Insurer** shall waive the foregoing time period; or

2)  sixty (60) days after:

a)  this Policy expires or terminates and is not renewed with the **Insurer**; or

b)  the expiration date of the Discovery Period, if applicable.

B.  Notwithstanding the conditions and obligations set forth in Subsection A., above, in the event the **Insured** fails to provide timely notice of a **Claim**, coverage may be denied by the **Insurer** solely on the basis of late notice only if the **Insurer** can show that such late notice materially prejudiced its interests.

C.  If during the **Policy Period** or the Discovery Period (if applicable), the **Insured** becomes aware of any circumstances which reasonably may be expected to give rise to a **Claim** being made against an **Insured**, and gives written notice to the **Insurer** of such circumstances, including the anticipated alleged **Wrongful Act(s)**, the reasons for anticipating such a **Claim**, and full particulars as to dates, persons and entities involved, then any **Claim** subsequently made against the **Insureds** arising out of the circumstances described in such notice shall be deemed to have been made at the time such notice was received by the **Insurer**.

D.  The **Insureds** shall give notice to the **Insurer** under this Section at the address set forth by Endorsement to this Policy.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

CGTC 3068 (12/17)

**NAMED INSURED:**    Stroma Medical Corporation
**POLICY NUMBER:**    PDO9000829

**THIS ENDORSEMENT MODIFIES:**    GENERAL TERMS AND CONDITIONS

## CALIFORNIA CHANGES ENDORSEMENT

In consideration of the payment of premium for this Policy, it is understood and agreed that Section **XII. GENERAL CONDITIONS**, Subsection A. Cancellation and Non-Renewal, Paragraph 3. of the GENERAL TERMS AND CONDITIONS is deleted and replaced with the following:

3.  a.  Subject to the provisions of sub-paragraph 3.b below, if the **Insurer** elects not to renew this Policy, the **Insurer** will mail or deliver written notice, stating the reason for nonrenewal, to the **Named Insured** shown in the Declarations and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date. We will mail or deliver our notice to the Named Organization, and to the producer of record, at the mailing address shown in the policy.

    b.  We are not required to send notice of nonrenewal in the following situations:

        i.   If the transfer or renewal of a policy, without any changes in terms, conditions or rates, is between us and a member of our insurance group.

        ii.  If the policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph B.1.

        iii. If you have obtained replacement coverage, or if the Named Organization has agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

        iv.  If the policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.

        v.   If the Named Organization requests a change in the terms or conditions or risks covered by the policy within 60 days of the end of the policy period.

        vi.  If we have made a written offer to the Named Organization, in accordance with the time frames shown in Paragraph B.1., to renew the policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

---

Includes copyrighted material of Insurance Services Office, Inc.,    CGTC 3082CA (01/18)
with its permission.

**NAMED INSURED:**   Stroma Medical Corporation
**POLICY NUMBER:**   PDO9000829

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

## DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**SCHEDULE**

| **SCHEDULE - PART I** |
| --- |
| **Terrorism Premium (Certified Acts):**      $ 0 |
| **This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(ies):** |
| AlphaPack Commercial |
| **Additional information, if any, concerning the terrorism premium:** |
| **Federal share of terrorism losses:**  82%    **Year:** 2018<br>(Refer to Paragraph B. in this endorsement.) |
| **Federal share of terrorism losses:**  81%    **Year:** 2019<br>(Refer to Paragraph B. in this endorsement.) |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part **II** of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

© Insurance Services Office, Inc., 2015

**IL 09 85 01 15**

**NAMED INSURED:** Stroma Medical Corporation
**POLICY NUMBER:** PDO9000829

**THIS ENDORSEMENT MODIFIES:** GENERAL TERMS AND CONDITIONS

## DUTY TO DEFEND AND 100% DEFENSE EXPENSES ALLOCATION ENDORSEMENT

In consideration of the payment of premium for this Policy, it is understood and agreed that the Policy is amended as follows:

1. Section **IV. DEFENSE AND SETTLEMENT** of the GENERAL TERMS AND CONDITIONS is deleted and replaced with the following:

   **IV. DEFENSE AND SETTLEMENT**

   A. It shall be the duty of the **Insurer**, and not the duty of the **Insureds**, to defend any **Claim**. Such duty shall exist even if such **Claim** is groundless, false or fraudulent, provided, however, that the **Insurer** shall not be obligated to defend such **Claim** after the least of the following has been exhausted: (i) the Policy Maximum Aggregate Limit of Liability; (ii) the Aggregate Limit of Liability of the applicable **Coverage Part**; or (iii) any applicable Sub-Limit of Liability.

   B. The **Insurer** may make any investigation it deems necessary, and shall have the right to settle any **Claim;** provided, however, no settlement shall be made without the consent of the **Named Insured**, such consent not to be unreasonably withheld.

   C. The **Insureds** agree not to settle or offer to settle any **Claim,** incur any **Defense Expenses**, or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the prior written consent of the **Insurer,** such consent not to be unreasonably withheld. The **Insurer** shall not be liable for any settlement, **Defense Expenses,** assumed obligation, or admission to which it has not consented. The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(s).

   D. The **Insureds** agree to provide the **Insurer** with all information, assistance and cooperation which the **Insurer** reasonably requests and agree that, in the event of a **Claim,** the **Insureds** will do nothing that shall prejudice the position of the **Insurer** or its potential or actual rights of recovery.

2. Section **XI. ALLOCATION**, Subsection B. of the GENERAL TERMS AND CONDITIONS is deleted and replaced with the following:

   B. In the event that the **Insurer** and the **Insureds** cannot agree upon an allocation, the **Insurer** shall make an interim payment for the **Loss** that is not in dispute until a different amount shall be agreed upon or determined pursuant to the provisions of this Policy and applicable law. Notwithstanding the above, the **Insurer** shall pay, on behalf of the **Insureds**, all **Defense Expenses** incurred in defense of any **Claim** that is in whole or in part covered under this Policy.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

CGTC 3073 (12/17)

**NAMED INSURED:**      Stroma Medical Corporation
**POLICY NUMBER:**      PDO9000829

**THIS ENDORSEMENT MODIFIES:**      GENERAL TERMS AND CONDITIONS

## NOTICE ENDORSEMENT

In consideration of the payment of premium for this Policy, it is understood and agreed that Notice under the Policy is to be provided as follows:

1.    Notice of **Claims**, notice of circumstances, or notice of any other matter for which coverage may be sought:

<u>**Claims Notices**</u>
Eric Levine - FI Professional Liability
4 World Trade Center
150 Greenwich Street, 47th Floor
New York, NY 10007
Tel: (212) 785 - 2000
Fax: (212) 785 - 2001
Email: ValidusFIClaims@validusuw.com

2.    All other notices or communications:

<u>**All Other Policy Notices**</u>
Underwriting Manager - FI Professional Liability
4 World Trade Center
150 Greenwich Street, 47th Floor
New York, NY 10007
Tel: (212) 785 - 2000
Fax: (212) 785 - 2001

CGTC 3079 (12/17)

**NAMED INSURED:**    Stroma Medical Corporation
**POLICY NUMBER:**    PDO9000829

**THIS ENDORSEMENT MODIFIES:**    GENERAL TERMS AND CONDITIONS

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
## (BROAD FORM)

In consideration of the payment of premium for this Policy, it is understood and agreed that this insurance does not apply:

1.  To liability:

    a.  With respect to which an **Insured** under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    b.  Resulting from the **Hazardous Properties** of **Nuclear Material** and with respect to which:

        i.  Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

        ii.  The **Insured** is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2.  To liability resulting from **Hazardous Properties** of **Nuclear Material**, if:

    a.  The **Nuclear Material**:

        i.  Is at any **Nuclear Facility** owned by, or operated by or on behalf of, an **Insured**; or

        ii.  Has been discharged or dispersed therefrom;

    b.  The **Nuclear Material** is contained in **Spent Fuel** or **Waste** at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an **Insured**; or

    c.  The liability arises out of the furnishing by an **Insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **Nuclear Facility**, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion 2.c applies only to **Property Damage** to such **Nuclear Facility** and any property thereat.

As used in this endorsement:

1.  **Hazardous Properties** includes radioactive, toxic or explosive properties.

2.  **Nuclear Material** means **Source Material**, **Special Nuclear Material** or **By-Product Material**.

3.  **Source Material**, **Special Nuclear Material**, and **By-Product Material** have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

4.  **Spent Fuel** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **Nuclear Reactor**.

5.  **Waste** means any waste material:

    a.  Containing **By-Product Material** other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its **Source Material** content, and

    b.  Resulting from the operation by any person or organization of any **Nuclear Facility** included under the first two paragraphs of the definition of **Nuclear facility**.

6.  **Nuclear Facility** means:

    a.  Any **Nuclear Reactor**;

    b.  Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing **Spent Fuel**, or (3) handling, processing or packaging **Waste**;

    c.  Any equipment or device used for the processing, fabricating or alloying of **Special Nuclear Material** if at any time the total amount of such material in the custody of the **Insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; or

    d.  Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of **Waste**;

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

7.  **Nuclear Reactor** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

8.  **Property Damage** includes all forms of radioactive contamination of property.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

FI 3006 (03/18)

**NAMED INSURED:**    Stroma Medical Corporation
**POLICY NUMBER:**    PDO9000829

**THIS ENDORSEMENT MODIFIES:**    GENERAL TERMS AND CONDITIONS

## U.S. ECONOMIC AND TRADE SANCTIONS ENDORSEMENT

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), such coverage shall be null and void.

Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

**NAMED INSURED:**    Stroma Medical Corporation
**POLICY NUMBER:**    PDO9000829

**THIS ENDORSEMENT MODIFIES:**    EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART

## ABSOLUTE BODILY INJURY / PROPERTY DAMAGE EXCLUSION ENDORSEMENT

In consideration of the payment of premium for this **Policy**, it is understood and agreed that solely with respect to the EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART, Section **III. GENERAL POLICY EXCLUSIONS**, Subsection B. of the GENERAL TERMS AND CONDITIONS of this **Policy** is deleted and replaced with the following:

    B.  arising out of, based upon or in consequence of, resulting from or in any way involving any bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or for damage to or destruction of any tangible property including loss of use thereof;

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

CDO 3006 (10/17)

**NAMED INSURED:**     Stroma Medical Corporation
**POLICY NUMBER:**     PDO9000829

**THIS ENDORSEMENT MODIFIES:**     EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART

## ADDITIONAL SIDE A LIMIT AMENDED ENDORSEMENT

In consideration of the payment of premium for this **Policy**, it is understood and agreed that EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART of the **Policy** is amended as follows:

Section **I. INSURING AGREEMENTS**, Subsection A. **Insured Person Coverage For Non-Indemnified Loss**, Paragraph 2. **Additional Dedicated Limit of Liability**, Sub-Paragraph a. is deleted and replaced with the following:

    a.   Notwithstanding anything in this **Policy** to the contrary, an Additional Dedicated Limit of Liability for Non-Indemnified **Loss**, if purchased as indicated in Item 2. of the Declarations, shall be an additional Limit of Liability available solely for **Loss** covered under Insuring Agreement A.1., and shall be in an amount not to exceed $1,000,000 per **Claim** and in the aggregate, which amount is in addition to, and not part of, the Aggregate Limit of Liability for this **Coverage Part**, as set forth in Item 2. Of the Declarations.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

CDO 3002 (10/17)

**NAMED INSURED:**    Stroma Medical Corporation
**POLICY NUMBER:**    PDO9000829

**THIS ENDORSEMENT MODIFIES:**    EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART

## CRISIS MANAGEMENT EXPENSE COVERAGE

In consideration of the payment of premium for this **Policy**, it is understood and agreed that the EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART of the **Policy** is amended as follows:

1.  Section I. **INSURING AGREEMENTS** is amended by adding the following Insuring Agreement:

    **Crisis Management Expense Coverage**

    Subject to the Sub-Limit of Liability set forth in Item 2. of the Declarations, the **Insurer** shall pay, on behalf of the **Company**, **Crisis Management Expenses** which the **Company** becomes legally obligated to pay arising from a **Crisis Event** taking place prior to the end of the **Policy Period**, and which is first made against such **Insured** during the **Policy Period** or the **Discovery Period** (if applicable) and is reported to the **Insurer** in the time and manner required by this **Policy**.

2.  Item 2. of the Declarations under the EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART is amended by adding the following:

    Sub-Limit of Liability for **Crisis Management Expense Coverage:**    $25,000

    Retention for **Crisis Management Expense Coverage**:    $25,000

3.  Section **II. DEFINITIONS** is amended by adding the following definitions:

    **Crisis Event** means:

    a.  The incapacity, death, or state or federal criminal indictment of an **Insured Person**;

    b.  The **Company** disclosure of its intention to file or actual filing of protection under federal bankruptcy laws; or

    c.  Any other material event which, in the **Company's** good faith opinion, has caused a **Material Effect**.

    **Crisis Management Expenses** means the following expenses incurred by the **Company** during a period beginning ninety (90) days prior to and in reasonable anticipation of a **Crisis Event** and ending ninety (90) days after an actual or reasonably anticipated **Crisis Event**, whether or not a **Claim** is actually made with respect to the subject **Crisis Event**; provided, however, that the **Insurer** must have been notified of the **Crisis Management Expenses** within thirty (30) days of the date the **Company** first incurs the subject **Crisis Management Expenses**:

    a.  The reasonable and necessary expenses directly resulting from a **Crisis Event** which the **Company** incurs for **Crisis Management Services** provided by a **Crisis Management Firm**; and

    b.  The reasonable and necessary expenses directly resulting from a **Crisis Event** incurred for:

        (1)  Advertising, printing, or the mailing of matter relevant to the **Crisis Event**; and

        (2)  Out of pocket travel expenses incurred by or on behalf of the **Company** or the **Crisis Management Firm**;

            provided, however, **Crisis Management Expenses** does not include those amounts which otherwise would constitute compensation, benefits, fees, overhead, charges or expenses of an **Insured**.

**Crisis Management Firm** means a marketing firm, public relations firm, law firm, or other professional services entity retained by the **Insurer** or by the **Company** with the **Insurer's** prior written consent, to perform **Crisis Management Services** arising from a **Crisis Event**.

**Crisis Management Services** means the professional services provided by a **Crisis Management Firm** in counseling or assisting the **Company** in reducing or minimizing the potential harm caused by the public disclosure of a **Crisis Event**.

**Material Effect** means the publication of unfavorable information regarding the **Company** which can reasonably be considered to materially reduce public confidence in the **Company's** competence, integrity or viability to conduct business. Such publication must occur in a report about an **Insured** appearing in a daily newspaper of general circulation; or a radio or television news program.

4.  Regardless of the number of **Crisis Events** occurring during the **Policy Period**, and regardless of when payment is made by the **Insurer** or when an **Insured's** legal obligation with regard thereto arises or is established, the **Insurer**'s maximum limit of liability for all **Crisis Management Expenses** arising from all **Crisis Events**, combined, shall be the amount referenced in Item 2. of the Declarations, as amended by this Endorsement, which amount shall be part of and not in addition to Aggregate Limit of Liability stated in Item 2. of the Declarations for this **Coverage Part**.

5.  Section **III. EXCLUSIONS** shall not apply to **Crisis Management Expenses**.

6.  It is understood and agreed that any actual or anticipated **Crisis Management Event** must be reported to the **Insurer** as soon as practicable after the **Company** first incurs **Crisis Management Expenses** for which coverage will be requested under this Endorsement. The **Company** may incur **Crisis Management Expenses** without the **Insurer's** prior consent, provided that the **Insurer** has consented to the **Crisis Management Firm** retained by the **Company**.


ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

**NAMED INSURED:**    Stroma Medical Corporation
**POLICY NUMBER:**    PDO9000829

**THIS ENDORSEMENT MODIFIES:**    EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART

## FALSE ADVERTISING/PRODUCT DEFECT EXCLUSION ENDORSEMENT

In consideration of the payment of premium for this **Policy**, it is understood and agreed that in Section **III. EXCLUSIONS** of the EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART of the **Policy** is amended by adding the following Exclusion applicable to all **INSURING AGREEMENTS**:

The **Insurer** shall not be liable to pay any **Loss**, and shall not be obligated to defend, any **Claim** made against any **Insured** based upon, arising out of, or attributable to any actual or alleged any of the following:

1. malfunction, defect, or failure of any goods or products manufactured, distributed, sold, installed, marketed, developed or processed by the **Insured**;

2. failure of goods, products, brands or services to conform with any statements or misrepresentations of quality or performance made in the advertising, promotions, marketing or labeling;

3. incorrect or inadequate or misleading description of goods, products, brands or services in the advertising, marketing, promotions or labeling;

4. failure to warn or to provide any warnings relating to any risks associated with the use of any goods, products, brands or services, whether required by statute, law, ordinance, regulation or by common law, including but not limited to California Proposition 65, or any other similar or substantially similar federal, state, or local statute; or

5. manufacture or production of any goods, products, brands or services according to the design intended by the **Insured** which does not:

   a. contain any defect in manufacture or production; or

   b. have any unexpected or unintended results, consequences, outcomes or effects.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

CDO 3007 (10/17)

**NAMED INSURED:**     Stroma Medical Corporation
**POLICY NUMBER:**     PDO9000829

**THIS ENDORSEMENT MODIFIES:**     EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART

## PROFESSIONAL SERVICES EXCLUSION WITH SECURITYHOLDER CARVEBACK ENDORSEMENT

In consideration of the payment of premium for this Policy, it is understood and agreed that Section **III. EXCLUSIONS** of the EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART of the Policy is amended as follows:

1.  Exclusion F. is deleted.

2.  The following Exclusion is added:

    The following Exclusion is applicable to all **INSURING AGREEMENTS**:

    The **Insurer** shall not be liable to pay any **Loss** arising from any **Claim** arising out of, based upon or in consequence of, resulting from or in any way involving any **Insured's** performance of or failure to perform professional services for others; provided, however, that this exclusion shall not apply to a **Claim** brought by or on behalf of a securityholder of the **Company** solely in his/her/its capacity as such, provided that such **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **Insured**.


ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

CDO 3022 (10/17)

# EXHIBIT B

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
Central Justice Center
700 W. Civic Center Drive
Santa Ana, CA 92702

**SHORT TITLE:** Blumberg vs. STROMA Medical Corporation

| CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE | CASE NUMBER:<br>**30-2020-01172565-CU-BC-CJC** |
|---|---|

I certify that I am not a party to this cause. I certify that that the following document(s), Judgment dated 10/23/25, was transmitted electronically by an Orange County Superior Court email server on October 27, 2025, at 4:20:21 PM PDT. The business mailing address is Orange County Superior Court, 700 Civic Center Dr. W, Santa Ana, California 92701. Pursuant to Code of Civil Procedure section 1013b, I electronically served the document(s) on the persons identified at the email addresses listed below:

GRODSKY, OLECKI & PURITSKY LLP
ALLEN@THEGOLAWFIRM.COM

GRODSKY, OLECKI & PURITSKY LLP
JOHN@THEGOLAWFIRM.COM

LEECH TISHMAN NELSON HARDIMAN
AGRODSKY@LEECHTISHMAN.COM

LEECH TISHMAN NELSON HARDIMAN
CPURITSKY@LEECHTISHMAN.COM

PPRC LAW, APC
LITIGATION@PPRCLAW.COM

Clerk of the Court, by: _____ , Deputy

---

**CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE**

**V3 1013a (June 2004)**

Code of Civ. Procedure , § CCP1013(a)

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE

OCT 23 2025

DAVID H. YAMASAKI, Clerk of the Court

BY_____DEPUTY

SUPERIOR COURT OF CALIFORNIA

COUNTY OF ORANGE – CENTRAL JUSTICE CENTER

| | |
|---|---|
| SAMUEL BLUMBERG, an individual, | Case No. 30-2020-01172565-CU-BC-CJC |
| Plaintiff, | Assigned for all purposes to the Hon. Kimberly A. Knill, Dept. C31 |
| vs. | |
| STROMA MEDICAL CORPORATION, a Delaware corporation; DOUGLAS DANIELS, an individual; GREGG HOMER, an individual; and DOES 1 through 100, inclusive, | [PROPOSED] SECOND AMENDED JUDGMENT ON SPECIAL VERDICT |
| Defendants. | |
| STROMA MEDICAL CORPORATION, a Delaware corporation, | |
| Cross-Complainant, | Action filed:   July 22, 2020 |
| vs. | Trial:            January 9, 2023 |
| SAMUEL BLUMBERG, an individual, and ROES 1 through 100, inclusive, | |
| Cross-Defendants. | |

-1-

SECOND AMENDED JUDGMENT ON SPECIAL VERDICT

The case came on for trial on January 23, 2023 in Department C-17 of the Superior Court of the State of California, in and for the County of Orange, before the Honorable Kimberly A. Knill, Judge presiding.  Plaintiff Samuel Blumberg appeared by Paul P. Cheng of PPRC Law APC.  Defendants Stroma Medical Corporation, Douglas Daniels, and Gregg Homer appeared by Allen B. Grodsky of Grodsky Olecki & Puritsky LLP.

A jury was regularly impaneled and sworn.  Witnesses were sworn and testified.  Following the hearing of all evidence, the jury was duly instructed by the Court.  The case was submitted to the jury.  The jury deliberated and thereafter returned into the Court on February 10, 2023, with its special verdict on Phase 1 of the trial, and on February 15, 2023, with its special verdict on Phase 2 of the trial.  These special verdicts were filed with the Clerk and entered upon the minutes.

In addition, on May 15, 2023, the Court entered its Order Granting in Part and Denying in Part Defendants' Motion for Judgment Notwithstanding the Verdict; Conditionally Granting in Part and Denying In Part Defendants' Motion for New Trial; and Denying Plaintiff's Motion for New Trial.

On November 27, 2023, the Court entered its Order granting attorney's fees and costs.

On May 14, 2025, the Court of Appeal issued its opinion affirming in part and reversing in part the judgment, and remanding for entry of an amended judgment. WHEREFORE, the Court hereby enters a Second Amended Judgment as follows:

1.     Against Defendants Stroma Medical Corporation and Homer and in favor of Plaintiff Samuel Blumberg for conversion of the convertible notes in the amount of $270,130.00; Defendant Stroma Medical Corp. has satisfied $219,619.80 of this portion of the judgment pursuant to the Acknowledgment of Partial Satisfaction of Judgment, filed August 4, 2023.;

-2-

SECOND AMENDED JUDGMENT ON SPECIAL VERDICT

2.    Against Defendants Stroma Medical Corporation and Homer and in favor of Plaintiff Samuel Blumberg for conversion re: stock options in the amount of $22,825.03;

3.    Against Defendant Stroma Medical Corporation and in favor of Plaintiff Samuel Blumberg for punitive damages in the amount of $1,000,000;

4.    Against Defendant Homer and in favor of Plaintiff Samuel Blumberg for punitive damages in the amount of $168,126;

5.    Against Defendant Stroma Medical Corporation and in favor of Plaintiff Samuel Blumberg for attorney's fees in the amount of $250,803.26;

6.    Against Defendant Stroma Medical Corporation and in favor of Plaintiff Samuel Blumberg for costs in the amount of $41,970.96;

7.    Against Plaintiff Blumberg and in favor of Defendants Homer and Daniels for attorney's fees in the amount of $113,633.26;

8.    Against Plaintiff Blumberg and in favor of Defendants Homer and Daniels for costs in the amount of $33,741.59;

9.    In favor of Defendant Douglas Daniels against Plaintiff Samuel Blumberg; Plaintiff Blumberg shall take nothing under his complaint against Douglas Daniels;

10.    In favor of Defendant Homer against Plaintiff Samuel Blumberg on Plaintiff's cause of action for breach of contract; Plaintiff Blumberg shall take nothing under his cause of action for breach of contract against Homer; and

11.    In favor of Cross-Defendant Samuel Blumberg and against Cross-Complainant Stroma Medical Corporation on the Cross-Complaint; Cross-Complainant

///

///

-3-

SECOND AMENDED JUDGMENT ON SPECIAL VERDICT

Stroma Medical Corporation shall take nothing under its Cross-Complaint against Cross-Defendant Samuel Blumberg.

IT IS SO ORDERED.

Dated: 10/23/2025

Kimberly a. Knill

Hon. Kimberly A. Knill
Judge of the Superior Court

-4-

SECOND AMENDED JUDGMENT ON SPECIAL VERDICT

**EFiled: Feb 21 2026 02:43PM EST**
**Transaction ID 78524115**
**Case No. N26C-02-525 KMM CCLD**

**SUPERIOR COURT OF THE STATE OF DELAWARE**
**IN AND FOR NEW CASTLE COUNTY**

| | |
|---|---|
| STROMA MEDICAL CORPORATION, a Delaware corporation, <br><br> and <br><br> GREGG HOMER, an individual, <br><br>     *Plaintiffs*, <br><br> v. <br><br> STRATFORD INSURANCE COMPANY, an insurance company authorized to do business in Delaware, <br><br>     *Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) <br><br> C.A. No. _____ <br><br> JURY TRIAL DEMANDED |

## PRAECIPE

TO:   Prothonotary
      Superior Court of the State of Delaware
      Leonard L. Williams Justice Center
      500 North King Street
      Wilmington, Delaware 19801

PLEASE ISSUE Summons in the form attached hereto for service of process on the below named Defendant. The Defendant can be served under 10 *Del. C.* § 3104 and Plaintiffs' counsel will serve the Summons and Complaint by certified or registered mail, postage prepaid, return receipt requested, at the following address:

Stratford Insurance Company
300 Kimball Drive, Suite 500
Parsippany, New Jersey 07054

BAYARD, P.A.

*/s/ Sarah T. Andrade*
Sarah T. Andrade (No. 6157)
Joshua K. Tufts (No. 7275)
600 N. King Street, Suite 400
Wilmington, DE 19801
sandrade@bayardlaw.com
jtufts@bayardlaw.com
(302) 655-5000

Dated: February 21, 2026

*Attorneys for Plaintiffs Stroma Medical
Corporation and Gregg Homer*

2

**SUPERIOR COURT**
**CIVIL CASE INFORMATION STATEMENT (CIS)**

EFiled: Feb 21 2026 02:43PM EST
Transaction ID 78524115
Case No. N26C-02-525 KMM CCLD

COUNTY:    (N)    K    S           CIVIL ACTION NUMBER: _____

| | |
|---|---|
| **Caption:**<br><br>STROMA MEDICAL CORPORATION, and<br><br>GREGG HOMER,<br><br>          Plaintiffs,<br><br>    v.<br><br> STRATFORD INSURANCE COMPANY,<br><br>        Defendant. | Civil Case Code: CCLD<br><br>Civil Case Type: Complex Commercial Litigation Division<br>(SEE REVERSE SIDE FOR CODE AND TYPE)<br><br>MANDATORY NON-BINDING ARBITRATION (MNA)  No<br><br>Name and Status of Party filing document:<br><br>Stroma Medical Corporation and Gregg Homer, Plaintiffs<br><br>Document Type:(E.G.; COMPLAINT; ANSWER WITH COUNTERCLAIM)<br><br>Complaint<br><br>JURY DEMAND:  YES  X  NO _____ |
| **ATTORNEY NAME(S):**<br>Sarah T. Andrade; Joshua K. Tufts<br><br>**ATTORNEY ID(S):**<br>6157; 7275<br><br>**FIRM NAME:**<br>Bayard, P.A.<br><br>**ADDRESS:**<br>600 North King Street, Suite 400<br>Wilmington, Delaware 19801<br><br>**TELEPHONE NUMBER:**<br>(302) 655-5000<br><br>**FAX NUMBER:**<br>(302) 658-6395<br><br>**E-MAIL ADDRESS:**<br>sandrade@bayardlaw.com; jtufts@bayardlaw.com | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT OR ANY RELATED CASES THAT HAVE BEEN CLOSED IN THIS COURT WITHIN THE LAST TWO YEARS BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS:<br><br>_____<br><br>_____<br><br>EXPLAIN THE RELATIONSHIP(S):<br><br>_____<br>_____<br>_____<br>_____<br>_____<br><br>OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT:<br><br>_____<br>_____<br>_____<br>_____<br><br>(IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGE) |

**THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER, OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED. THE FAILURE TO FILE THE CIS AND HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.**

Revised 10/2025

EFiled:  Feb 21 2026 02:43PM EST
Transaction ID 78524115
Case No. N26C-02-525 KMM CCLD

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| STROMA MEDICAL CORPORATION, a Delaware corporation, | ) ) ) ) |
| and | ) ) |
| GREGG HOMER, an individual, | ) ) ) |
| *Plaintiffs*, | ) C.A. No. _____ ) |
| v. | ) JURY TRIAL DEMANDED ) ) |
| STRATFORD INSURANCE COMPANY, an insurance company authorized to do business in Delaware, | ) **Service Pursuant to** ) **10** *Del. C.* **§ 3104** ) ) ) ) |
| *Defendant*. | ) ) ) |

## SUMMONS

**TO: PLAINTIFFS' COUNSEL**
**YOU ARE COMMANDED:**

To summon the above-named Defendant Stratford Insurance company so that, within 20 days after service hereof, exclusive of the day of service, Defendant shall serve upon Plaintiffs' attorney, Sarah T. Andrade, whose address is Bayard, P.A., 600 North King Street, Suite 400, Wilmington, Delaware 19801, an answer to the Complaint.

To serve upon Defendant a copy hereof and of the Complaint.

Dated: _____

_____
Prothonotary

_____
Per Deputy

**TO THE ABOVE-NAMED DEFENDANT:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on Plaintiffs' attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated: _____       _____

Prothonotary

_____

Per Deputy